PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

       *Plaintiff-Appellee,*

v.

TIFFANIE ANITA BRACK,

       *Defendant-Appellant.*

No. 10-4493

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
Thomas D. Schroeder, District Judge.
(1:08-cr-00471-TDS)

Argued: May 10, 2011

Decided: July 5, 2011

Before TRAXLER, Chief Judge, and AGEE and
DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Chief Judge Traxler and Judge Diaz joined.

## COUNSEL

**ARGUED:** Leslie Carter Rawls, Charlotte, North Carolina, for Appellant. Frank Joseph Chut, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee. **ON BRIEF:** John W. Stone, Jr., Acting

United States Attorney, Greensboro, North Carolina, for Appellee.

## OPINION

AGEE, Circuit Judge:

By posing as a bail bondsman at a North Carolina jail, Tiffanie Brack secured identifying information, cash, and the title to two properties from William Sapp, an octogenarian attempting to post bond for his granddaughter. Using Sapp's identifying information, Brack obtained multiple lines of credit that she used to make various purchases. Brack was subsequently arrested and pled guilty to one count of wire fraud and one count of aggravated identity theft. *See* 18 U.S.C. §§ 1343 & 1028A(a)(1). At sentencing, the district court applied an abuse-of-trust enhancement to Brack's Guidelines offense level based on her purported position as a bail bondsman. *See* United States Sentencing Guidelines ("U.S.S.G.") § 3B1.3. Brack now challenges that ruling on appeal. For the reasons stated herein, we affirm the judgment of the district court.

### I.

William Sapp traveled to a jail in Greensboro, North Carolina to post bail for his granddaughter, Renee Staton. Once there, Sapp was approached by Tiffanie Brack, who falsely presented herself as a licensed bail bondsman in North Carolina. Brack offered to help Sapp obtain Staton's release but stated that she first required Sapp's social security card, driver's license, and ATM card. Sapp provided these items to Brack with the expectation that she would return them after making copies.

On two subsequent occasions, Brack requested Sapp provide collateral to secure his granddaughter's bond. Sapp first

gave Brack "a bag full of money" containing at least $16,568 in cash. Joint Appendix ("J.A.") at 157. Brack later indicated to Sapp that more collateral was required in order to bond out Staton. When Sapp explained that his savings were exhausted, Brack asked whether he owned any real property. She then accepted the deeds to two properties Sapp owned in lieu of a second cash payment. Although Brack then attempted to sell both properties, her efforts were unsuccessful.

Brack's dealings with Sapp continued after these initial transfers of assets. Brack began to call Sapp "daddy" or "granddaddy" and occasionally asked him to accompany her on shopping trips. On one occasion, Sapp accompanied Brack when she used a line of credit opened in Sapp's name to purchase a Chihuahua for herself. Sapp also traveled with Brack to a meeting with a car salesman during which Sapp signed a $49,937 loan agreement that Brack used to buy a Land Rover. At the time authorities interviewed Sapp about these later transactions, he was eighty years old and did not remember either event. Sapp clearly stated, however, that he "never gave [Brack] permission to use his identity or other information to apply for, obtain, or use any credit cards, lines of credit, or automobile loans." *Id.*

Authorities obtained a warrant to search Brack's residence and uncovered a record of Sapp's social security number and date of birth, as well as the deeds to Sapp's two properties. Evidence in the home revealed that Brack used Sapp's identifying information to establish two lines of credit on which she incurred $9,398.31 in charges. In addition, investigators discovered that Brack made $1,058.27 in purchases using a fraudulently obtained debit card linked to Sapp's checking account. Further evidence demonstrated that Sapp was not Brack's only victim, as she had obtained and used identifying and financial information belonging to a number of other persons.

## II.

A grand jury ultimately issued a superseding indictment charging Brack with nine counts of aggravated identity theft, *see* 18 U.S.C. § 1028A(a)(1), four counts of bank fraud, *see* 18 U.S.C. § 1344(1), one count of social security fraud, *see* 42 U.S.C. § 408(a)(7)(B), four counts of unauthorized use of an access device, *see* 18 U.S.C. § 1029(a), and two counts of wire fraud, *see* 18 U.S.C. § 1343. Pursuant to a written plea agreement, Brack agreed to plead guilty to one count of wire fraud and one count of aggravated identity theft. Both of these charges were predicated on Brack's transmission of a fraudulent credit application containing Sapp's identifying information. In return, the Government moved to dismiss the remaining counts of the superseding indictment.

As the crime of aggravated identity theft carries a mandatory, two-year sentence consecutive to "any other term of imprisonment . . . under any other provision of law," 18 U.S.C. § 1028A(b)(2), the Presentence Investigation Report ("PSR") focused solely on calculating Brack's offense level for purposes of the wire fraud count. That count carries a base offense level of 6, which the PSR adjusted upward on three separate grounds: (1) a 12-level enhancement based on the amount of loss, (2) a 2-level vulnerable-victim enhancement, and (3) a 2-level enhancement for abusing a position of public or private trust. Brack then received a 3-level downward adjustment based on her acceptance of responsibility, resulting in a total offense level of 19. In tandem with Brack's criminal history category of IV, an offense level of 19 resulted in an advisory Guidelines range of 46 to 57 months' imprisonment.

At sentencing, Brack made several objections to the PSR's calculation of the appropriate amount of loss.[1] She did not,

---

[1]The district court accepted one of Brack's arguments after the Government stipulated that Sapp transferred $16,568, rather than $34,000, in cash to Brack. Because this amendment of the PSR is not relevant to the issue presented on appeal, we do not further discuss it.

however, challenge the PSR's inclusion of the 2-level, offense-level enhancement for abusing a position of public or private trust. The district court subsequently adopted the PSR's recommended Guidelines range on the wire fraud count of 46 to 57 months' imprisonment.

After considering the 18 U.S.C. § 3553(a) factors, the district court varied upward, imposing a 70-month sentence on the wire fraud count. The court based this 13-month increase above the top of the applicable Guidelines range on "the extensive breadth of [Brack's] fraudulent activity," her "total disregard for the rights of others," and "the enormity of the financial loss" resulting from her crimes, which "includ[ed] the taking of properties from an 80-year-old man under false pretenses." J.A. at 131. Brack consequently received a total sentence of 94 months' imprisonment, as her conviction for aggravated identity theft carried the mandatory, consecutive term of imprisonment of 24 months.

## III.

On appeal, Brack recognizes that an abuse-of-trust enhancement may apply to an imposter, provided she claims to hold a position of public or private trust. Brack disputes, however, that a bail bondsman occupies such a position. She contends that a bail bondsman in North Carolina "engages in an arms-length commercial relationship with [her] customers, and does not occupy a position of trust." Opening Br. at 8. Accordingly, Brack argues that "[a]ny trust between Ms. Brack and Mr. Sapp" is attributable to "Ms. Brack's personality and Mr. Sapp's credulity," not Brack's purported position as a licensed bail bondsman. *Id.* Brack accordingly requests that we vacate her sentence and remand for "resentencing without the two-level offense level increase" for abusing a position of public or private trust. *Id.* at 15.

In response, the Government notes that Brack failed to challenge the applicability of the abuse-of-trust enhancement

before the district court. It consequently argues that our review is only for plain error. Under these facts, the Government contends no error, plain or otherwise, occurred because "the adjustment [was] appropriate." Response Br. at 9. The Government makes two primary arguments in support of its position. First, "[i]n North Carolina, [a] bail bondsman's relationship with h[er] client [has] some of the legal aspects of a fiduciary or trustee." *Id.* at 12.

Second, "the issue of whether a defendant held a position of trust must be examined from the perspective of the victim." *Id.* The Government contends that Sapp believed "Brack held a position of trust as a licensed bail bondsman — one who had the ability to help him secure the release of his granddaughter." *Id.* Thus, the relationship Brack formed with Sapp was predicated on her purported role as a bail bondsman, not extraneous considerations such as "Brack's personality or Sapp's credulity." *Id.* at 14. For example, "Brack was able to approach Sapp because she presented herself as a bail bondsman" and Sapp later "provided cash, property and his personal information" to Brack only after she "told him [these items] were needed [to secure a] bond." *Id.* The Government accordingly requests we affirm Brack's sentencing enhancement for abuse of trust.

## IV.

We normally review de novo the district court's legal conclusion regarding the application of an abuse-of-trust enhancement, whereas we review the court's accompanying factual findings only for clear error. *See United States v. Caplinger*, 339 F.3d 226, 235-36 (4th Cir. 2003). Appellate review of a sentence is generally waived, however, "when [a] defendant fails to object to [her] sentence calculation in the district court." *United States v. Grubb*, 11 F.3d 426, 440 (4th Cir. 1993). In this case, Brack failed to object to application of the abuse-of-trust enhancement at sentencing.

Our review of the district court's application of the abuse-of-trust enhancement is consequently for plain error, a standard which requires Brack to establish (1) an error, (2) that is plain, that not only (3) affects her substantial rights, but also (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Dawson*, 587 F.3d 640, 645 (4th Cir. 2009). An error is "plain" when it is "obvious or clear under current law." *United States v. Knight*, 606 F.3d 171, 177 (4th Cir. 2010). To prevail on appeal, Brack must consequently show that "the settled law of the Supreme Court or this circuit establishes" the district court erred in imposing a sentencing enhancement for abuse of trust. *United States v. Neal*, 101 F.3d 993, 998 (4th Cir. 1996) (quotation omitted).

## V.

Under § 3B1.3 of the Sentencing Guidelines, a 2-level, offense-level enhancement applies if a defendant "abuse[s] a position of public or private trust . . . in a manner that significantly facilitate[s] the commission or concealment of the offense." The abuse-of-trust enhancement applies to imposters, so long as "the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust."[2] U.S.S.G. § 3B1.3 cmt. n.3. This is so because "[i]n making the misrepresentation, the defendant assumes a position of trust, relative to the victim, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were held legitimately." *Id.*

---

[2]"The Guidelines' policy statements and commentary are generally entitled to treatment as authoritative guides with controlling weight, unless they are inconsistent with a statute or the Sentencing Guidelines themselves." *United States v. Abdelshafi*, 592 F.3d 602, 611 n.9 (4th Cir. 2010) (quotation and alteration omitted). We accordingly give due weight to § 3B1.3's application note 1.

A.

In this case, Brack does not contest the fact that she provided Sapp with sufficient indicia for him to conclude she was a duly licensed bail bondsman. Her sole argument on appeal is that bail bondsmen in North Carolina do not occupy a position of public or private trust as a matter of law. Such a position of trust is generally "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3 cmt. n.1. Our precedent makes clear, however, that a defendant's lack of "complete discretion" does not preclude the application of an abuse-of-trust enhancement, provided she "holds some substantial degree of trust." *United States v. Gordon*, 61 F.3d 263, 269 (4th Cir. 1995).

We have long since "rejected a mechanistic approach to the abuse of trust enhancement that excludes defendants from consideration based on their job titles." *United States v. Akinkoye*, 185 F.3d 192, 203 (4th Cir. 1999). Instead, our inquiry consists of "an individualized determination of each defendant's culpability." *United States v. Moore*, 29 F.3d 175, 179 (4th Cir. 1994). In assessing individual culpability under § 3B1.3, we adopt "the perspective of the victim," not that of the defendant. *United States v. Abdelshafi*, 592 F.3d 602, 611 (4th Cir. 2010).

Two requirements must be met before the abuse-of-trust enhancement can be properly said to apply to a given defendant. First, the defendant must occupy and "abuse[ ] a position of public or private trust." U.S.S.G. § 3B1.3. If the nature of the defendant's position is in doubt, three primary factors inform our inquiry as to whether the defendant held a position of trust: (1) whether the defendant had special duties or access to information not available to other employees, (2) the extent of the defendant's discretion, and (3) whether the defendant's acts indicate she is more culpable than similarly situated criminal actors. *See Akinkoye*, 185 F.3d at 203.

Second, the defendant's abuse of trust must "significantly facilitate[ ] the commission or concealment of the offense." U.S.S.G. § 3B1.3. In other words, the "position of public or private trust must . . . contribute[ ] in some significant way to facilitating the commission or concealment of the" defendant's underlying crime. *Id.* § 3B1.3 cmt. n.1. A position of trust may "significantly contribute" to the defendant's execution or obfuscation of the offense simply "by making the detection of the offense or the defendant's responsibility for the offense more difficult." *Id.*

Indeed, the central purpose of § 3B1.3 is to "penalize[ ] defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong." *United States v. Bollin*, 264 F.3d 391, 415 (4th Cir. 2001) (quotation omitted). The abuse-of-trust enhancement accordingly applies when a "victim's trust is based on the defendant's [unique] position," but not when "trust is created" in an "arms-length commercial relationship[ ]" based on "the defendant's personality or the victim's credulity." *Id.* (quotation omitted). It is thus clear that "fraud alone does not justify the enhancement." *Id.* Before imposing a § 3B1.3 enhancement, courts consequently look for evidence indicating "a fiduciary or personal trust relationship" exists between the victim and the defendant. *Caplinger*, 339 F.3d at 237 (quotation omitted).

B.

To determine whether Brack assumed a position of trust in relation to Sapp by posing as a licensed bail bondsman, we first examine the legal responsibilities North Carolina imposes upon members of that field. Our review of the relevant statutory provisions makes clear that bail bondsmen in North Carolina are subject to a comprehensive system of state regulation. Professional bail bondsmen, for example, are required to apply for and obtain a license from the North Carolina Commissioner of Insurance ("the Commissioner"), who is entitled to "propound any reasonable interrogatories to an

applicant" concerning "the applicant's qualifications, residence, prospective place of business, and any other matters that the Commissioner considers necessary to protect the public and ascertain the qualifications of the applicant." N.C. Gen. Stat. § 58-71-40(b). Qualifications for licensure are established by statute and require applicants to undergo a criminal history check and meet other requirements related to age, education, residency, and training. *See id.* § 58-71-50.

Once an individual acquires a bail bondsman license, she is required to "maintain a deposit of securities with . . . the Commissioner of a fair market value of at least one-eighth the amount of all bonds or undertakings written in th[e] State." *Id.* § 58-71-145. Any collateral a bail bondsman accepts must similarly be assured by "a written receipt" and must "be held and maintained in trust." *Id.* § 58-71-100. If collateral takes the form of a "cash or check or other negotiable instrument," it must be deposited "within two banking days after receipt, in an established, separate noninterest-bearing trust account in any bank located in North Carolina." *Id.* Bail bondsmen are prohibited from "commingl[ing]" these "trust account funds . . . with other operating funds," *id.*, and must keep "[a]ll records related to" their business separate and intact "for not less than three years." *Id.* § 58-71-168.

From this brief overview of the relevant legal framework, it is clear that licensed bail bondsmen in North Carolina hold a position of public trust that entails the assumption of certain fiduciary duties to their clients. This fact is most clearly evident when one considers the North Carolina statutes related to bail bondsmen's handling of collateral. One traditional hallmark of a "fiduciary" relationship is the "exercise [of] a high standard of care in managing another's money or property." Black's Law Dictionary (9th ed. 2009). North Carolina law holds bail bondsmen to just such a standard in the handling of collateral deposited to secure their services.

Indeed, bail bondsmen in North Carolina are held to a standard of care that is remarkably similar to the standard attor-

neys, as fiduciaries, must adhere to in managing the property of clients. The American Bar Association's Model Rule of Professional Conduct 1.15, for instance, requires not only that a lawyer "hold property of clients . . . separate from the lawyer's own property. . . . in a separate account maintained in the state where the lawyer's office is situated," but also that "[c]omplete records of such account funds and other property . . . be kept by the lawyer and . . . preserved for" five years. Licensed bail bondsmen in the State of North Carolina occupy a position that carries essentially the same fiduciary obligations. *Cf.* N.C. Gen. Stat. §§ 58-71-100 & 58-71-168. We therefore conclude that Brack represented herself to Sapp as holding "a position of public or private trust" within the meaning of U.S.S.G. § 3B1.3.

Of course, the fact that Brack assumed a position of trust in relation to Sapp is not alone sufficient to justify a § 3B1.3 sentencing enhancement. That position must also have "significantly facilitated the commission or concealment of [Brack's] offense." U.S.S.G. § 3B1.3. Under the facts of this case, we conclude that standard is met. Not only did Brack's purported position as a bail bondsman provide a seemingly valid basis for her to make initial contact with Sapp at the jail, it also allowed Brack to secure Sapp's identifying information without revealing her criminal intent. Brack later used that identifying information to complete the fraudulent credit application that formed the factual predicate for her wire-fraud offense. Claiming the office of a licensed bail bondsman thus "contributed in [a] significant way to facilitating the commission [and] concealment of [Brack's] offense," as it made "detection of the offense" considerably "more difficult." U.S.S.G. § 3B1.3 cmt. n.1.

To circumvent this conclusion, Brack analogizes the facts of this case to those of *United States v. Caplinger*, 339 F.3d 226 (4th Cir. 2003). *Caplinger* involved a defendant who induced his victims to invest in a fraudulent pharmaceutical scheme by posing as an accomplished physician. *See id.* at

229-30. The district court applied a § 3B1.3 enhancement based on the conclusion that Caplinger thereby abused a position of trust. *See id.* at 232. On appeal, this Court concluded that "the fact that Caplinger posed as a physician d[id] not by itself mean that he occupied a position of trust." *Id.* at 237.

"Caplinger did not assume a physician-patient relationship with any of the victims." *Id.* The investors' trust in Caplinger therefore could not have been "based on a[ny] special relationship he had with them as a physician;" instead, it derived from Caplinger's "entrepreneurial" representations concerning the "project's potential for success." *Id.* Because these representations took place in the context of an "arms-length commercial" transaction, they did not implicate "a fiduciary or personal trust relationship." *Id.* (quotation omitted). This Court therefore concluded that Caplinger did not abuse a "'position of trust'" within the meaning of § 3B1.3. *Id.* at 238.

We find Brack's reliance on *Caplinger* misplaced. Caplinger never entered into a physician-client relationship with his victims and thus avoided forming a "fiduciary or personal trust relationship." *Id.* at 237 (quotation omitted). Consequently, we could not conclude that Caplinger took advantage of a fiduciary or trust relationship "to perpetrate or conceal [his] offense." *Id.* (quotation omitted).

Conversely, Brack's initial relationship with Sapp was predicated solely on her purported position as his bail bondsman, a position we have already recognized entails certain fiduciary obligations. Brack then actively employed the legitimacy conferred by this unique position to commit and conceal her offense. Under these facts, the rationale of *Caplinger* simply does not apply.

We also reject Brack's suggestion that subsequent events demonstrate her trust relationship with Sapp was predicated on her "personality" and Sapp's "credulity," not her purported position as a licensed bail bondsman. *Id.* (quotation omitted).

Section 3B1.3 does not require that a position of trust further a defendant's every unlawful act. The guideline simply requires that a position of trust "*significantly* facilitate[ ] the commission or concealment of the offense." U.S.S.G. § 3B1.3 (emphasis added). Because it is undisputed that Brack gained initial access to Sapp's personal information by posing as a bail bondsman and later used this information to commit her wire-fraud offense, that standard is clearly met here. Accordingly, the district court did not err, plainly or otherwise, in imposing a § 3B1.3 enhancement for abuse of trust.

## VI.

For all of the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*