**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 10-4515

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DONNA MARIE GEORGE,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, Senior District Judge. (1:09-cr-00431-JCC-1)

ARGUED: December 6, 2011          Decided: February 21, 2012

Before TRAXLER, Chief Judge, and DUNCAN and AGEE, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Charles Burnham, BURNHAM & GOROKHOV PLLC, Washington, D.C., for Appellant. Joshua L. Rogers, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Neil H. MacBride, United States Attorney, Gene Rossi, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Donna Marie George was convicted of one count of conspiracy to distribute oxycodone and two counts of distribution of oxycodone and sentenced to 148 months' imprisonment. See 21 U.S.C. §§ 841, 846. George appeals, challenging her convictions and sentence. For the reasons set forth below, we affirm.

I.

Viewed in the light most favorable to the government, the evidence presented at trial established that George was addicted to prescription narcotics. She fed her addiction through "doctor shopping" – seeing multiple doctors to get multiple prescriptions and selling the extra pills. Most of the prescriptions were for Oxycontin, a time-released version of oxycodone, although George obtained and used other pain medications as well. Lisa and Richard Sindelar were also addicts; they supported their habit by forging prescriptions. Using a computer and a copier, the Sindelars created prescriptions that appeared to be written by a doctor at a pain clinic.

A mutual acquaintance introduced George and the Sindelars in March 2007, and George thereafter began selling the Sindelars' pills. The Sindelars initially sold the drugs to the mutual acquaintance, who then sold them to George, who distributed them at the street level. In May 2007, the

2

Sindelars began working directly with George. By June 2007, George and the Sindelars had become good friends. George regularly babysat for the Sindelars' young children, and Richard Sindelar occasionally created the fake prescriptions at George's house. George's adult daughter, Cindy Carter, was frequently at her house, and Carter and Lisa Sindelar also became friends. Carter, who was also addicted to pain pills, sometimes served as one of the runners who took the Sindelars' forged prescriptions to a pharmacy for filling.

In September 2007, Carter was arrested after filling a fake prescription. Carter agreed to cooperate with the FBI, and Richard Sindelar was arrested shortly after Carter called him to arrange a drug transaction. Lisa Sindelar was arrested in October 2007. After the Sindelars were arrested, George carried on, getting her supply through her doctor-shopping scheme and occasionally from a connection in Washington, D.C. George was finally arrested by the FBI in August 2009.

The Sindelars eventually pleaded guilty to drug-distribution charges, but George proceeded to trial. At trial, Lisa Sindelar testified that she and her husband lacked George's contacts and that George was their main street-level distributor. According to Sindelar, she and her husband were providing George with as many as four or five 90-pill

3

prescriptions a day, and George was buying $8,000 – $10,000 worth of drugs a week from them.

George's position at trial was that while she was addicted to prescription medications and sometimes bought and sold a few pills, she was not part of the conspiracy operated by the Sindelars. Although George did not testify, her claim of limited involvement with the Sindelars was supported by the testimony of George's daughter, who was a reluctant witness for the government. On cross-examination, Carter disputed much of Sindelar's testimony. Carter testified that George did not know about the Sindelars' prescription scheme and that George, who did not have a job, had money problems and thus could not have been buying $8,000 – $10,000 worth of pills a week as Sindelar claimed. The jury was not persuaded by Carter's testimony and found George guilty of conspiracy to distribute oxycodone and distribution of oxycodone.

At the sentencing hearing, the district court heard testimony from Agent Andrew Lenhart, who testified about the drug quantities involved in the conspiracy, and from Carter, who again disputed her mother's involvement in the Sindelar conspiracy and testified about the quantity of narcotics personally consumed by George in order to manage her pain. The district court found Agent Lenhart's testimony to be credible and accepted the drug-quantity calculations as set forth in the

4

PSR. The district court determined that George's base offense level was 34 and that a two-level obstruction-of-justice enhancement should be applied, resulting in a total offense level of 36. That offense level, when combined with George's category I criminal history, yielded an advisory sentencing range of 188-235 months. The district court varied downward and imposed concurrent sentences of 148 months for each of the three counts. This appeal followed.

## II.

We turn first to George's claim that she is entitled to a new trial because the government failed to fulfill its disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963). Brady and its progeny "require[] a court to vacate a conviction and order a new trial if it finds that the prosecution suppressed materially exculpatory evidence." United States v. King, 628 F.3d 693, 701 (4th Cir. 2011). Accordingly, a defendant seeking a new trial under Brady must "(1) identify the existence of evidence favorable to the accused; (2) show that the government suppressed the evidence; and (3) demonstrate that the suppression was material." Id.

A week after trial, the government informed George that, notwithstanding the government's "open file" discovery policy, five documents inadvertently had been placed in a separate file and thus had not been reviewed by George's trial attorney. Only

5

three of those documents remain relevant on appeal -- notes from separate investigative interviews of Lisa and Richard Sindelar and a document prepared by an FBI agent during the investigation that summarized the evidence and status of the investigation. The notes of the Sindelar interviews had been reviewed by George's first attorney, who was relieved before trial, but not by the attorney who represented her at trial. The investigation summary had not been disclosed to either attorney. After learning about the documents, George filed a motion seeking a new trial, arguing that the government breached its disclosure obligations and that a new trial was therefore required under Brady. The district court denied the motion, concluding that the investigation summary was neither favorable to George nor material, and that the Sindelar interview notes, while favorable to George, had not been suppressed and were not material.

On appeal, George contends that the documents were favorable to her and material, and that they were suppressed because the government failed to include them in the discovery file. George therefore argues that the district court erred by denying her motion for a new trial.

## A. Sindelar Interview Notes

As noted by the district court in its order denying George's motion for a new trial, George's first attorney personally reviewed (but did not retain a copy of) the notes of

6

the Sindelar interviews.  In light of that fact, the district court concluded that the interview notes were not suppressed by the government.  We agree.

For Brady purposes, "[s]uppressed evidence is information which had been known to the prosecution but unknown to the defense."  Spicer v. Roxbury Corr. Inst., 194 F.3d 547, 557 (4th Cir. 1999) (internal quotation marks omitted).  However, there is no Brady violation if "defense counsel could have discovered the evidence through reasonable diligence," United States v. Kelly, 35 F.3d 929, 937 (4th Cir. 1994), or if "the defense already possesses the evidence," United States v. Higgs, 663 F.3d 726, 735 (4th Cir. 2011).  This court has already concluded that there is no suppression within the meaning of Brady if the evidence was disclosed to one of the defendant's original attorneys but not to the attorney who ultimately represented the defendant at trial.  See King, 628 F.3d at 702.  Although there was no open-file discovery policy at issue in King, we do not believe that factual difference is significant.

If the government elects to comply with its Brady obligations by instituting an open-file policy, "defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under Brady."  Strickler v. Greene, 527 U.S. 263, 283 n.23 (1999).  The defendant's right to rely on the completeness of the discovery

7

file might, under certain circumstances, defeat an argument by the government that there was no Brady violation because the evidence could have been discovered by the defense through a reasonably diligent investigation, see, e.g., Gantt v. Roe, 389 F.3d 908, 912-13 (9th Cir. 2004), and it might likewise help to establish in collateral proceedings the "cause" necessary for consideration of a procedurally defaulted Brady claim, see Strickler, 527 U.S. at 289. But when evidence omitted from the discovery file was nonetheless disclosed to the defense in some other manner, we fail to see why the defendant's right to assume the completeness of the file or the government's imperfect execution of its open-file policy should somehow invalidate that prior disclosure. As noted above, we define "suppressed evidence" as evidence "known to the prosecution but unknown to the defense." Spicer, 194 F.3d at 557. Evidence that has been disclosed to the defense is not "unknown to the defense" simply because it was not included in the prosecution's discovery file.

In this case, the Sindelar interview notes were disclosed to one of George's attorneys, and that disclosure was sufficient to satisfy the government's Brady obligations. See King, 628 F.3d at 702. While it may be that George's first attorney failed to inform trial counsel of the existence of the notes, or failed to convey to trial counsel all of the relevant details from the interview notes, that failure is not attributable to

8

the government and does not affect the validity of the disclosure.  See id. ("We recognize that some information may have failed to reach King's trial counsel, given that King changed attorneys three times and that his escape from custody forced the court to reschedule the trial.  But the Government need only disclose exculpatory evidence, not ensure that the defense further develop and utilize that evidence."); cf. Morales v. Ault, 476 F.3d 545, 555 (8th Cir. 2007) (finding reasonable a state court's determination that evidence had not been suppressed for Brady purposes when it was disclosed to defendant's original attorney).  Accordingly, we agree with the district court that the Sindelar interview notes were not suppressed within the meaning of Brady.

## B.  Investigation Summary

The investigation summary appears to be a mid-investigation review prepared, apparently for personal use, by Andrew Lenhart, an FBI agent who investigated the case and testified at trial and at sentencing.  The summary was written at some point before George was arrested in August 2009, probably in late 2008, given that the latest date mentioned is October 31, 2008.  The document gives a synopsis of the Sindelars' prescription-forging activities and lists the evidence against the Sindelars and Cindy Carter, among others.  George is listed as a subject of the investigation, but her name otherwise appears only in

9

reference to statements George made to law enforcement officials, which were included in the list of evidence against other subjects of the investigation. The investigation summary mentions no evidence against George herself.

There is no dispute that the investigation summary was "suppressed" within the meaning of Brady. As to whether the summary is favorable, George argues that the summary is exculpatory and has impeachment value because it shows no evidence against her, which suggests that the agent "did not truly consider her a co-conspirator when [the summary] was prepared, despite a presumably thorough investigation." Brief of Appellant at 17. Even if we were to accept that argument, we agree with the district court that the summary was not material.

Undisclosed evidence is material when its cumulative effect is such that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (internal quotation marks omitted). "A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." Smith v. Cain, 2012 WL 43512, *2 (U.S. Jan. 10, 2012) (No. 10-8145) (internal quotation marks and alteration omitted).

10

In our view, the likelihood that disclosure of the investigation summary would have resulted in a different outcome is so small that it does not undermine our confidence in the verdict.

The summary is simply a snapshot of the investigation at a single point in time; the government's failure at that particular moment to have nailed down evidence against George provides no basis for rejecting the evidence later gathered. Moreover, the lack of evidence at the time the summary was prepared was likely a reflection of the evolving stories told by the Sindelars. When the Sindelars were arrested and first interviewed, they gave statements implicating themselves, each other, and other family members, but not George. The Sindelars eventually admitted the full scope of their prescription-forging scheme and George's involvement with that scheme, pleaded guilty, and agreed to cooperate with the government. Counsel for George knew that the Sindelars' stories to law enforcement had evolved over time, and on cross-examination counsel questioned Lisa Sindelar about her failure to initially implicate George and raised the possibility that Sindelar was shading her testimony to earn a favorable sentencing recommendation from the government. Had it been disclosed, the summary perhaps could have provided counsel with another path to make the same point about the evolution in the Sindelars' story, but the summary provided no new basis for impeaching Sindelar or

otherwise challenging the government's case. We therefore conclude that the investigation summary was not "material" for Brady purposes. See United States v. Cooper, 654 F.3d 1104, 1120 (10th Cir. 2011) (Undisclosed evidence that is "cumulative of evidence of bias or partiality already presented and thus would have provided only marginal additional support for the defense" is not material for Brady purposes (internal quotation marks and alteration omitted)); Tankleff v. Senkowski, 135 F.3d 235, 251 (2d Cir. 1998) ("When a witness's credibility has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a Brady claim.").

Because the Sindelar interview notes were not suppressed and the investigation summary was not material, the district court committed no error in denying George's motion for a new trial.[1]

---

[1] We need not consider George's argument that the district court improperly considered the materiality of the documents in isolation, rather than considering the cumulative materiality of all the documents. See, e.g., United States v. Ellis, 121 F.3d 908, 916 (4th Cir. 1997). Because the Sindelar interview notes were not suppressed, the question of materiality arises only as to the investigation summary.

III.

We turn now to George's challenges to the sentence imposed by the district court.

A.

George first contends that the district court's explanation of its drug-quantity determination was insufficient because the court did not mention the testimony of Cindy Carter, much less explain why it found her testimony less credible than that of the Agent Lenhart. We disagree.

District courts are required to make findings as necessary to resolve disputed factual issues that are relevant to sentencing. See Fed. R. Crim. P. 32(i)(3); U.S.S.G. § 6A1.3. Although the court need not set out its findings in great detail, the findings must be sufficient to show how the court ruled on the disputed matters and to permit "effective appellate review of the sentence imposed." United States v. Bolden, 325 F.3d 471, 497 (4th Cir. 2003).

When announcing its drug-quantity finding, the district court stated that it found the trial testimony of the government's witnesses to be credible as to the nature of the conspiracy and George's involvement in it, and the court likewise stated that it found Agent Lenhart's testimony at the sentencing hearing to be credible. Because Carter's testimony about her mother's involvement in the prescription-forging

13

conspiracy was diametrically opposed to that of the government's witnesses, the court's statement that it found Agent Lenhart and the trial witnesses to be credible was an implicit but nonetheless clear rejection of Carter's testimony. We have never required a sentencing court to explain in any detail why it found the testimony of one witness more credible than another, and the court's explanation of its drug-quantity finding otherwise was more than sufficient to permit meaningful appellate review. See Bolden, 325 F.3d at 497 ("[T]he court need not articulate findings as to disputed factual allegations with minute specificity." (internal quotation marks and alteration omitted)); see also United States v. Boulware, 604 F.3d 832, 837 (4th Cir. 2010) (district court's explanation of its sentencing decision must "be sufficient to satisfy the appellate court that the district court has considered the parties' arguments and has a reasoned basis for exercising its own legal decisionmaking authority" (internal quotation marks and alterations omitted)).

B.

George also challenges the substance of the district court's drug-quantity finding, arguing that the court erred by including pills that were prescribed for legitimate medical purposes.

14

When determining the drug quantity attributable to George, the district court rejected George's argument that any pills that were properly prescribed for legitimate medical needs should be excluded from the calculation. In rejecting this argument, the district court relied on out-of-circuit cases holding that drugs possessed for personal use should be excluded from the drug-quantity calculation in cases where the defendant was convicted of distribution or possession with intent to distribute, but should not be excluded if the defendant is convicted of conspiracy to distribute. See, e.g., United States v. Asch, 207 F.3d 1238, 1243-44 (10th Cir. 2000) ("Every circuit to address the question has held that where a member of a conspiracy to distribute drugs handles drugs both for personal consumption and distribution in the course of the conspiracy, the entire quantity of drugs handled is relevant conduct for purposes of calculating the base offense level pursuant to the Guidelines."); United States v. Kipp, 10 F.3d 1463, 1465-66 (9th Cir. 1993) ("Drugs possessed for mere personal use are not relevant to the crime of possession with intent to distribute because they are not part of the same course of conduct or common scheme as drugs intended for distribution." (internal quotation marks omitted)). Because George was convicted of conspiracy, the district court concluded that any pills

15

prescribed and intended for her personal use were properly included in the drug-quantity calculation.

On appeal, George contends that the district court's reliance on the out-of-circuit cases was misplaced because those cases involve "street" drugs, such as crack and marijuana, that are illegal to possess in all circumstances. Under the Sentencing Guidelines, a defendant convicted of conspiring to distribute controlled substances "is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3 cmt. n.2 (emphasis added). George argues that prescription medications, unlike street drugs, are not contraband. And because the district court accepted the evidence showing that George began taking pain medication to treat genuine physical problems, George contends that the court erred by refusing to exclude from the drug-quantity calculations the pills that were prescribed to her for legitimate medical purposes.

At the time of George's sentencing, there were no published opinions from this court addressing the personal-use question in either the street-drug or prescription-drug context. We have, however, recently concluded that the distinction between

16

conspiracy convictions and distribution convictions that has been drawn in cases involving street drugs is not necessarily applicable in cases involving prescription drugs. See United States v. Bell, ____ F.3d ____, 2011 WL 6396482 (4th Cir. Dec. 21, 2011). Recognizing that "relevant conduct under the Guidelines must be criminal conduct," United States v. Dove, 247 F.3d 152, 155 (4th Cir. 2001), the court in Bell concluded that, because prescription drugs can be legally possessed, "only those quantities the defendant conspired or intended to possess unlawfully, i.e., with intent to distribute" can be considered relevant conduct. Bell, 2011 WL 6396482 at *10. The court therefore held that if the government seeks to attribute to the conspiracy the total quantity of drugs prescribed to a member of the conspiracy, the government

> must also provide evidence, and the district court must make a finding, of something more -- for example (1) that the conspiracy actually distributed a particular amount; (2) that the person who was prescribed the drug lawfully kept and consumed only a portion (or none) of the prescribed amount; (3) that the pills were obtained fraudulently and thus cannot be considered to have been lawfully obtained and possessed; or (4) that each and every pill obtained, even if pursuant to a valid prescription, was obtained with the intent that it would or could be distributed.

Id. at *11 (emphasis added; citation and internal quotation marks omitted). The court believed that requiring anything less would "create[] an unacceptably high risk that a defendant will

17

be punished for drug quantities a portion of which was lawfully obtained, possessed and consumed." Id. at *10.

Although the district court did not have the benefit of Bell when sentencing George, it is now apparent that the district court erred by relying on the street-drug line of cases and attributing to George the full quantity of drugs without evidence of or a finding of the "something more" required by Bell. Id. at *11. As we explain below, however, the district court's error was harmless, and resentencing is therefore not required.

Bell contemplates excluding from the drug-quantity calculation those drugs that were "lawfully obtained, possessed and consumed" under a "valid prescription." Id. at *10, *11. In this case, it is apparent that none of the drugs obtained through the Sindelars' prescription-forgery scheme were lawfully obtained under a valid prescription. See 21 U.S.C. § 843(a)(3) (making it unlawful "to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge"); id. § 844(a) (making it unlawful "to possess a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice"). A strong argument can likewise be made that none of the drugs George obtained through her doctor-

18

shopping scheme were lawfully obtained. See, e.g., United States v. Young, 992 F.2d 207, 210 (8th Cir. 1993) (concluding that narcotics prescriptions that defendant obtained by "misleading several different doctors" were not valid prescriptions). Nonetheless, we will assume for purposes of this opinion that all of the drugs obtained through George's doctor-shopping scheme should have been excluded from the drug-quantity calculation.

The district court concluded that George should be held responsible for a total of 43,578 pills equivalent to 9,976.4 kilograms of marijuana, which resulted in a base offense level of 34. See U.S.S.G. § 2D1.1(c)(3) (assigning a base offense level of 34 to cases involving the equivalent of at least 3,000 but less than 10,000 kilos of marijuana). The prescription-forging portion of the conspiracy alone involved the equivalent of 4,103 kilograms of marijuana, such that George's base offense level would remain 34 after the exclusion of all doctor-shopping drugs. Because the exclusion of the doctor-shopping drugs from the drug-quantity calculation results in no change to George's offense level, the district court's error was harmless. See United States v. Cabrera-Beltran, 660 F.3d 742, 756 (4th Cir. 2011).

C.

Finally, George argues that the district court's mistaken view of her criminal record requires a remand for resentencing. We disagree.

One of the reasons the district court gave for its variance sentence was the substantial lapse of time since George's last conviction. The court stated that George's last conviction occurred in 1998, but the conviction actually occurred in 1988. George argues that if the district court had realized that it had been twenty-two years, not twelve years, since her last conviction, the court might have imposed an even lower sentence, and George therefore contends that the court's error about the date of her prior conviction requires resentencing. Because George did not object or otherwise bring the correct date to the court's attention, we review this claim for plain error only.

Under plain-error review, George bears the burden of establishing that the district court erred, that the error was plain, and that the error affected her substantial rights. See, e.g., United States v. Brack, 651 F.3d 388, 392 (4th Cir. 2011). A sentencing error affects a defendant's substantial rights if there is a non-speculative basis in the record for concluding that the court would have imposed a lower sentence but for the error. See United States v. Knight, 606 F.3d 171, 178 (4th Cir. 2010); United States v. Hernandez, 603 F.3d 267, 273 (4th Cir.

20

2010). In this case, there is nothing in the record affirmatively indicating that the court would have imposed a lower sentence if it had realized that more time had elapsed since George's last conviction. Accordingly, even if we assume that plain error occurred, George is not entitled to relief because she cannot show that the error affected her substantial rights.[2]

                              IV.

For the foregoing reasons, we conclude that the district court properly denied George's motion for a new trial, and we therefore affirm George's convictions. And because we conclude that the district court committed no reversible error in sentencing, we likewise affirm George's sentence.

                                              AFFIRMED

_____

[2] George contends that the sentencing errors she has identified require the district court to reconsider its forfeiture order. Because we have rejected George's sentencing challenges, we likewise reject her forfeiture challenge.

21