**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-4407**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

DASHAWN LEONARD GARRETT, a/k/a Dutch,

Defendant – Appellant.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Terrence W. Boyle, District Judge.  (5:21-cr-00201-BO-1)

_____

Argued:  January 24, 2024                           Decided:  February 19, 2025

Amended:  June 13, 2025

_____

Before GREGORY, QUATTLEBAUM, and BENJAMIN, Circuit Judges.

_____

Vacated and remanded by published opinion.  Judge Benjamin wrote the opinion, in which Judge Gregory joined.  Judge Quattlebaum wrote a dissenting opinion.

_____

**ARGUED**:  Nathan Ward Wilson, FOX ROTHSCHILD LLP, Raleigh, North Carolina, for Appellant.  Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF**:  Matthew N. Leerberg, FOX ROTHSCHILD LLP, Raleigh, North Carolina, for Appellant.  Michael F. Easley, Jr., United States Attorney, David A. Bragdon, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

_____

DEANDREA GIST BENJAMIN, Circuit Judge:

Dashawn Leonard Garrett withdrew his pending suppression motion, accepted a plea deal, and pled guilty to three charges arising from a drug trafficking investigation in Wilson County, North Carolina. After he was sentenced, he learned about information in a Government disclosure that, he contends, unearthed evidence of egregious police misconduct that affected the prosecution's integrity, and prosecutorial misconduct that blocked his ability to understand the case against him.

This appeal asks us to decide whether the newly discovered information renders Garrett's plea involuntary. We find that a reasonable defendant standing in Garrett's shoes would not have pled guilty had he or she known all the relevant information. Therefore, Garrett's plea was involuntary and is now vacated.[1]

I.

In early 2021, North Carolina law enforcement began using two confidential informants ("CI-1" and "CI-2," or collectively, "the CIs") to investigate suspected methamphetamine dealing. CI-1 alerted law enforcement that someone named Gregg McDuffie, also known as "Duff," was selling methamphetamine. J.A. 89.[2] Using the CIs as purchasers, law enforcement executed three controlled buys on who they thought was

---

[1] The Government filed a petition for panel rehearing (ECF No. 62). Judge Gregory and Judge Benjamin voted to deny the petition. Judge Quattlebaum voted to grant the petition. The petition is hereby denied.

[2] Citations to "J.A." refer to the joint appendix—the record of proceedings at the district court—filed by the parties.

McDuffie. As it turned out, however, the person they surveilled and believed to be McDuffie was Appellant Dashawn Garrett. We recite the facts here as law enforcement understood them at the time they occurred. Accordingly, all references to "McDuffie's" actions in sections I.A–I.C appear as they did in the warrant affidavits submitted to the warrant-granting judge, but the actions are actually attributable to Garrett.

## A.

In the first controlled buy, the Johnston County Sheriff's Office and Raleigh's Drug Enforcement Administration office established surveillance on McDuffie's residence. [J.A. 89]. CI-1 called McDuffie on a phone number ending in -1711 and arranged for the purchase of $860 worth of methamphetamine at a nearby McDonald's. [J.A. 89]. Law enforcement surveilled the residence as McDuffie left the house and drove to the McDonald's. They continued watching as CI-1, who was recording the interaction, entered McDuffie's car and purchased methamphetamine. CI-1 turned the recording and the drugs over to law enforcement after McDuffie left the premises.

Afterward, a Johnston County superior court judge issued Detective Ebersole of the Johnston County Sheriff's Office a warrant to tap the phone number McDuffie used to coordinate the buy ("the PRTT warrant"). S.A. 1007–20.[3] In the warrant's supporting

---

[3] The parties briefed this case without the benefit of the PRTT warrant. We granted a motion to supplement the record with the application at oral argument. Thus, it is properly before us for consideration. *See* ECF No. 40 (Government's motion to supplement the record with the warrant application); *id.* at S.A. 1007–20 (warrant application); Oral Argument at 0:00–0:10 (announcing the Government's motion to supplement the record is granted). We cite to "S.A." when referring to the supplemental appendix.

affidavit, Detective Ebersole affirmed that CI-1 advised Detective Massey, of the Wilson County Sheriff's Office, that "a Gregg McDuffie, alias 'Duff' . . . was involved in the distribution of multiple ounces of methamphetamine," and of the details of the evidence gathered in the first controlled buy. *Id.* at 1008.

### B.

In the second controlled buy, the City of Wilson Police Department, Wilson County Sheriff's Office, and Johnston County Sheriff's Office developed CI-2 as a confidential informant and used CI-2 to execute a second controlled buy. J.A. 92. CI-2 had never worked as a confidential informant before and was compensated for participation. Law enforcement intended for the second buy to mirror the first—they set up surveillance, and CI-2 called to arrange a purchase of methamphetamine and ecstasy pills. Before the deal began, McDuffie said that he could not deliver the drugs, but that his cousin, Trevor Cole-Evans, would stand in his place. J.A. 117. CI-2 then contacted Cole-Evans and purchased the drugs from him. Like the first buy, the entire exchange was recorded and surveilled.

After the second buy, a Wilson County superior court judge issued Detective Massey of the Wilson County Sheriff's Office a warrant to tap the phone number Cole-Evans used to facilitate the buy. The warrant application was supported by evidence of the first controlled buy where "[d]etectives were able to purchase a quantity of crystal methamphetamine from McDuffie," and evidence of Cole-Evans' involvement in the second buy. J.A. 117.

### C.

4

The City of Wilson Police Department, Wilson County Sheriff's Office, and Johnston County Sheriff's Office—the law enforcement groups from the second controlled buy—used CI-2 to initiate a third buy with McDuffie. [J.A. 94]. Like before, they established surveillance of the residence, observed McDuffie traveling to the purchase, and CI-2 recorded audio and visuals of the exchange.

A few days after the buy, a Johnston County Sheriff's Office deputy carried out a traffic stop. Cole-Evans was driving the car, and the person law enforcement knew as "McDuffie" was in the passenger seat. J.A. 94–95. The deputy conducted a probable cause search, discovered suspected methamphetamine, and placed both vehicle occupants under arrest. At this point, law enforcement discovered that the man they believed to be McDuffie was Dashawn Garrett. J.A. 232 (Department of Justice report stating that "during the traffic stop . . . it was discovered that who has been previously referred to as Gregg McDuffie in this case file is actually Dashawn Leonard Garrett."); *see also* J.A. 129 (Wilson County Sheriff's Office summary of events stating, "[i]nvestigators in this case mistakenly identified [Garrett] as Gregory Latroy McDuffie during the duration of this case. This mistake was found upon the arrest of Garrett"); J.A. 135–36 (Government briefing below stating that "[i]t was during this stop that Investigators discovered the man they'd been buying methamphetamine [from] . . . was not Gregory McDuffie, but instead" Garrett).

After the arrest, the Johnston County judge issued Detective Ebersole another warrant, this time to search the residence where law enforcement established surveillance for the controlled buys. The warrant application included a photo of the real McDuffie and

5

listed him as a person to be searched. J.A. 85. In the probable cause affidavit, Detective Ebersole again affirmed that CI-1 "advised Detective Massey that a Gregg McDuffie, alias 'Duff' . . . was involved in the distribution of multiple ounces of methamphetamine." J.A. 89. The affidavit chronicled the surveillance and the three controlled buys with "McDuffie," J.A. 89–94, and ended with the information about the arresting traffic stop, J.A. 94–95. Detective Ebersole stated that the arresting deputy "approached the passenger side [of the vehicle] and identified the passenger as Gregory McDuffie. [He] . . . then detected an overwhelming odor of green marijuana. A probable cause search of the vehicle recovered a large quantity of suspected methamphetamine. Both occupants were placed under arrest." J.A. 95.

## II.

On May 4, 2021, the Government filed an initial indictment, and on February 15, 2022, the Government charged Garrett and Cole-Evans in a joint nine-count indictment for various drug and firearm-related violations. *See* J.A. 326–31 (filed under seal). Both defendants moved separately to suppress the evidence that resulted from the search warrants. Garrett asked the court to suppress all evidence from the residence search, the PRTT warrant, and the arresting traffic stop. J.A. 70. Relevant here, he argued that the failure to disclose the identity mix-up between himself and McDuffie amounted to a material omission that defeated probable cause. J.A. 71–72, 74. In its opposition motion, the Government explained that a confidential informant told investigators that a man known as "Dutch," which is Garrett's nickname, was selling methamphetamine, and that

6

the informant positively identified McDuffie as "Dutch" based on a photo presented by investigators. J.A. 131. The Government's motion also detailed the three controlled buys, but never distinguished between the CIs. Instead, it referred only to one confidential source as "the CS" throughout the briefing. *See* J.A. 131–35.

Cole-Evans asked the court to suppress all information discovered through his phone tap and evidence discovered during the arresting traffic stop. J.A. 106. Briefing for both motions was completed by February 1, 2022. One day later, on February 2, 2022, while the motions were pending before the court, the Government provided the defendants with additional discovery disclosures. According to Garrett's counsel, the documents in the February 2 disclosure consisted of 775 pages of information.

On February 22, the court denied Cole-Evans' motion to suppress. Shortly afterward, Garrett moved to withdraw his motion because he thought proceeding would be "risky," given the denial of Cole-Evans' motion. Opening Br. at 7. According to Garrett, he was worried that "[t]he district court [might] interpret [his] decision to pursue the suppression motion . . . as a refusal to accept responsibility." *Id.* (internal quotation marks omitted). Instead, he stated his intent to accept a plea deal. On March 16, Garrett pled guilty to three counts of the indictment. The district court held a Rule 11 colloquy and confirmed that Garrett voluntarily entered the agreement. J.A. 261; *see also* Fed. R. Crim. P. 11(b)(1)–(2) (Under Rule 11, the court must determine that the defendant understands the effects of pleading guilty, and "the court must address the defendant personally in open court and determine that the plea is voluntary"). Four months later, on July 11, the district court sentenced Garrett to 240 months' imprisonment.

7

After Garrett was sentenced, Cole-Evans requested reconsideration of his suppression motion based on newly discovered evidence in the February 2 disclosure. Cole-Evans informed the court that the disclosure revealed, for the first time, that multiple CIs were used during the investigation. J.A. 286. He contended that until that point, the record was so uncertain that even the district court order adopted the mistaken belief that there was only one CI. *Id.* Additionally, the February 2 disclosure uncovered another previously undisclosed fact: CI-2 received compensation for participating in the controlled buys and was a first-time confidential informant. *Id.* The district court granted Cole-Evans' request for a reconsideration hearing, but before it occurred, the Government dropped all charges against him with prejudice.

Garrett subsequently filed this appeal, and now argues that his plea was involuntary and should be vacated based on the newly discovered evidence Cole-Evans outlined in his reconsideration motion. According to Garrett, the evidence reveals crucial omissions and misrepresentations that would have stopped him from entering the guilty plea. We have jurisdiction to hear Garrett's appeal under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

III.

When a defendant does not attempt to withdraw or otherwise challenge his plea before the district court, "we consider his . . . argument under the rigorous plain error standard." *United States v. Sanya*, 774 F.3d 812, 815–16 (4th Cir. 2014). To show plain error, Garrett must prove that "(1) an error was made; (2) the error is plain; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity or public

8

reputation of judicial proceedings." *United States v. Harris*, 890 F.3d 480, 491 (4th Cir. 2018).

A.

An error occurs where the circumstances surrounding a defendant's guilty plea do not comport with the Fifth Amendment Due Process Clause which requires that the plea be an "intentional relinquishment or abandonment of a known right or privilege." *McCarthy v. United States*, 394 U.S. 459, 466 (1969) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). A defendant who decides to plead guilty relinquishes a number of rights including some guaranteed by the Fifth and Sixth Amendments to the Constitution. As such, our system of justice requires that the defendant's plea "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (citations and quotation marks omitted). To be valid, the plea must also be made "with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970).

Even where a defendant is properly informed of all necessary information, considerations relevant to the plea-bargaining process "frequently present imponderable questions for which there are no certain answers" and lead to judgments "that in the light of later events seem improvident, although they were perfectly sensible at the time." *Brady*, 397 U.S. at 756–57. That being the case, a defendant is not entitled to withdraw his plea simply because he did not correctly assess the relevant factors or "his calculus misapprehended the quality of the [government]'s case." *Id.* at 757. Indeed, as the Supreme Court has said:

9

> A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Id.* at 755.

This court has interpreted these long-standing principles to permit vacatur of a guilty plea only where the defendant was not informed of the direct consequences of his plea, or his plea was elicited by improper conduct. This case involves the latter, as Garrett contends that government misconduct (committed by both the police and prosecutors) deprived him of information necessary to render his plea knowing and voluntary. To set aside his plea, therefore, Garrett must demonstrate that some "egregiously impermissible" government conduct that pre-dated the entry of his plea influenced (or was material to) his decision to plead guilty. *United States v. Fisher*, 711 F.3d 460, 465 (4th Cir. 2013); *see also United States v. Paylor*, 88 F.4th 533, 561 (4th Cir. 2023) ("If a defendant can show that there was egregiously impermissible conduct involved in his prosecution, he must next show that this misconduct influenced his decision to plead guilty.").

We applied this test in *Fisher*, where we vacated a guilty plea based on an officer's misrepresentations in the search warrant affidavit used to obtain all evidence of the defendant's crimes. There, a judge issued the search warrant based on the officer's false affirmations that a reliable, confidential informant identified the defendant, his home, and his car, and told the officer that the defendant distributed narcotics and possessed a handgun. That warrant authorized law enforcement to search the defendant's home where

10

they located evidence used to bring the charge to which he eventually pled guilty. The defendant became aware of the inaccuracies in the affidavit over a year later when the officer was accused of (and pled guilty to) criminal offenses related to his duties as a law enforcement officer. As a part of that plea, the officer admitted that the informant he identified in the warrant application in the defendant's case "had no connection to the case" and another person was "the real informant." *Fisher*, 711 F.3d at 463 (quotation marks omitted).

We concluded that the officer's false affirmations constituted impermissible conduct and influenced the defendant's decision to plead guilty thereby rendering his plea involuntary. In our view, the case involved "gross police misconduct that went to the heart of the prosecution's case" because the officer's "deliberate lie" provided the foundation for the warrant that led to recovery of all evidence against the defendant. *Fisher*, 711 F.3d at 466. We concluded that if the defendant had known that the warrant was not properly supported, or that the main witness' credibility was in question, he would not have pled guilty. In other words, the defendant's misapprehension of the government's case against him, we said, resulted not from his own calculus, but rather from "an affirmative government misrepresentation that [struck] at the integrity of the prosecution as a whole." *Id.*. We therefore held that, under the totality of the circumstances of that case, the defendant's plea was involuntary and violated his due process rights.

Relevant here, we acknowledged various aspects of our criminal justice system that counseled reaching that result. We recognized the "important interest of deterring police misconduct." *Id.* at 469. On that point, we noted that preventing defendants from

11

challenging pleas based on subsequently discovered misconduct could encourage officers to engage in or conceal misconduct to elicit guilty pleas. We also stated that "allowing a defendant's guilty plea to stand when a police officer intentionally lies in a search warrant affidavit undermines public confidence in our judicial system." *Id.* at 470. We believe those principles apply with equal force to all cases.

That brings us to the instant challenge. In this case, the ambiguity regarding the number of CIs used, bolstered by the omission of the details of each CI's involvement, and the failure to inform the warrant judge about the investigation's identification mix-up call those principles into question here. As discussed below, those critical deficiencies which occurred during the initial investigation and pre-plea phase and therefore formed the bedrock of the prosecution's case all evince errors that occurred before the district court and warrant vacatur. *Id.* at 466.[4] We address each in turn.

1.

a.

---

[4] In *Fisher*, the defendant moved for a certificate of appealability on a Sixth Amendment claim under 28 U.S.C. § 2255. *Fisher*, 711 F.3d 460, 463 (4th Cir. 2013). The district court granted the motion, and this court expanded the certificate of appealability to include whether "the belated disclosure of [the officer's] misconduct rendered" the plea invalid. *Id.* at 464. On appeal, the *Fisher* panel had the benefit of a record that unambiguously established that the warrant in question was a "critical [piece in the defendant's] evaluation of the government's case," and defense counsel "believed the government's case to be a strong one" based on it. *Id.* at 466 (internal quotation marks omitted). The record also showed the district court's belief that "unquestionably, if Defendant had known of [the officer's] criminal misconduct, he would have" acted differently. *Id.* at 467 (alterations adopted). Here, in contrast, the issue was not litigated below, so the record is not as clear-cut. Still, we find that the principles applied in *Fisher* are directly applicable here.

12

The police misconduct throughout the investigation process provided the shaky foundation on which the remainder of the case proceeded. As a threshold matter, we note that the affidavit does not distinguish between the CIs.[5] Indeed, contrary to the Government's (and the dissent's) contention, a hawkeyed reader would find, at best, that the affidavit only *infers* the use of multiple CIs. For the first controlled buy, the affidavit asserts that Detective Massey "developed a Confidential Source of Information (CS)," and that "CS placed a recorded phone call," and then executed the buy. J.A. 89–90. It states that "a CWP confidential informant (CS)" was used for the second controlled buy and indicates that "the CS" made an undercover purchase. J.A. 93. Yet again, the warrant's description of the third buy refers to CI-2 as simply "CS." As we will describe in the discussion regarding the prosecution's conduct, however, these slight inferences were not

---

[5] The Wilson County Sheriff's Office and the Johnston County Sheriff's Office were involved in all three controlled buys. *Compare* J.A. 89–90 ("Detective Massey with the Wilson County Sheriff's Office developed" CI-1, members of the Wilson County Sheriff's Office provided money for CI-1 to conduct the controlled buy and observed the controlled buy, and "members of the Johnston County Sheriff's Office" established stationary surveillance on the address provided by CI-1 for McDuffie leading up to the first controlled buy), *with* J.A. 92 ("[M]embers of DEA Group 2, City of Wilson Police Department (CWP), Wilson County Sheriff's Office (WCSO), and Johnston County Sheriff's Office (JCSO) participated in a second buy/walk operation"), *and* J.A. 94 ("[M]embers of DEA Group 2, City of Wilson Police Department (CWP), Wilson County Sheriff's Office (WCSO) and Johnston County Sheriff's Office (JCSO) participated in a 3rd buy/walk operation"). These controlled buys occurred on February 3, 2021 (J.A. 89), February 16, 2021 (J.A. 92), and February 24, 2021 (J.A. 94), respectively. Thus, when Detective Ebersole applied for the warrant to search the residence on March 9, 2021, the Johnston County Sheriff's Office's participation throughout the three controlled buys suggests that she was aware that multiple CIs were used, despite the ambiguity in the warrant application.

13

enough to provide clarity to the prosecution or to the court regarding the CIs' involvement in the investigation.[6]

Both the warrant judge and Garrett were unaware that CI-2, who participated in two of the buys, existed, let alone that he or she was a first-time informant, was paid for participation, and never identified Garrett as the drug dealer.  CI-1 also had critical issues —he or she misidentified Garrett by identifying him as McDuffie—and never corrected the mistake, even after being shown a photo of McDuffie, speaking on the phone with Garrett, and having a close face-to-face encounter with Garrett during the controlled buy. [J.A. 131–32].  An accurate portrayal of the CIs would have established that nobody identified Garrett and would have rightfully called their credibility into question.

Additionally, Garrett was arrested before the warrant application was submitted and thus any misapprehensions regarding his identity were clarified before Detective Ebersole sought the warrant.  Stated differently, when the evidence supporting probable cause was presented to the warrant judge, law enforcement was aware of information that contradicted their prior beliefs.  More importantly, law enforcement was aware of information that directly contradicted the information sworn to in the supporting affidavit.  Indeed, the record reflects that the investigating team, knew (1) that their informant provided incriminating information about McDuffie, a third-party individual who was not the subject of their investigation, (2) that CI-1 inaccurately provided what law enforcement then knew to be a false identification of the suspect—and that no eyewitness or CI identified Garrett

---

[6] *See* section III.A.1.b., *infra*.

14

as the drug dealer, (3) that CI-2 had concerning credibility issues, (4) that the evidence they relied on in the previous warrant affidavits now amounted to false or misleading information, and (5) that they had Garrett, not McDuffie, in custody.

Nevertheless, Detective Ebersole affirmed that McDuffie was positively identified by an informant, that McDuffie was the subject of the investigation, that the evidence continued to support the timeline previously established, and that McDuffie had been arrested. Like in *Fisher*, then, the warrant here was secured based on the affiant's knowing misrepresentation about a confidential informant's involvement in the case. *Fisher*, 711 F.3d at 466; *see also United States v. Barringer*, 25 F.4th 239, 250–51 (4th Cir. 2022) ("The Supreme Court has held that 'the investigation of wrongdoing is a proper governmental function; and since it is the very purpose of an investigation to uncover the truth, any falsehood relating to the subject of the investigation perverts that function.' ") (quoting *Brogan v. United States*, 522 U.S. 398, 402 (1998)).

During oral argument, the Government reasoned that the time between Garrett's arrest and the submission of the residence search warrant application provides a legitimate explanation for omission of the identity mix-up. The warrant application was submitted around one hour after Garrett's arrest; the Government contends that the affiant simply had not yet recognized or been informed of the discrepancy. Oral Argument at 37:20–39:11; *compare* J.A. 94 (on March 9, 2021, the arresting officer stopped the vehicle Garrett was a passenger in "at approximately 12[:]56 p.m."), *with* J.A. 82 (warrant application for residence search received by the court at 2:01 p.m. on March 9, 2021). However, as Garrett rightly described, that explanation conflicts with the information in the warrant application.

15

Had Detective Ebersole believed that McDuffie was the person law enforcement had in custody, the warrant application would have had no reason to list "Gregory Latroy McDuffie" as a person to be searched when the warrant on the residence is executed. J.A. 85. Although we make no explicit findings as to the wrongdoing or ill motive of any particular officer, the overarching principles of *Fisher* are met under these facts and we are careful not to muddle the relevant standard. This "is not a case where [Garrett] sought to withdraw his plea 'merely because he discovered long after the plea had been accepted that his calculus misapprehended the quality of the [Government]'s case . . . .'" *Fisher*, 711 F.3d at 466 (quoting *Brady*, 397 U.S. at 757) (alterations adopted). That circumstance does not give rise to an involuntary plea. *See Ferrara v. United States*, 456 F.3d 278, 289 (1st Cir. 2006) (stating that "a prisoner can collaterally attack his sentence on the ground that his guilty plea was not knowing or voluntary if his claim is based on evidence not available to him at the time of the plea"). At the time of Garrett's plea, he knew that law enforcement failed to disclose the identity mix-up. In fact, he willingly withdrew his suppression motion that argued the failure to disclose the mix-up rendered the warrant invalid. J.A. 72–75 (suppression motion); Opening Br. at 7. Consequently, an involuntary plea claim based only on the identification mix-up would fail. *Cf. United States v. Seng Chen Young*, 926 F.3d 582, 595 (9th Cir. 2019) (declining to apply *Fisher* because defendant knew of the government's misconduct at the time of the plea).

But here, it is the newly discovered information that acts as the basis of the involuntary plea. In other words, even if the suppression motion had been fully litigated, it would not have implicated or exposed the misconduct that the February 2 disclosure

16

uncovered.  The revelation that multiple CIs were used and the context of their involvement calls their credibility into question.  Additionally, it reveals information that would have materially bolstered Garrett's suppression argument and, if necessary, his subsequent trial strategy, by providing additional examples of misconduct.  Garrett would have known that the police knew that CI-1 repeatedly misidentified him; that CI-2, the only other informant, never identified Garrett as the suspect; and that law enforcement withheld that information (in addition to the identity mix-up) from the judge.

Collectively, this information reinforces Garrett's contention that by intentionally choosing to omit or misrepresent facts that weakened their case, law enforcement caused him to plead guilty without the benefit of all the facts leading to the prosecution's case against him.  The cumulative effect of this police misconduct provides compelling probative support for Garrett's position that intentional misconduct occurred.  Thus, we rely on the misinformation about the CIs as the basis of our involuntariness finding but reach the misidentification as a part of our review of the totality of the circumstances.[7] *Brady*, 397 U.S. at 749 ("The voluntariness of [Garrett's] plea can be determined only by considering all of the relevant circumstances surrounding it.").  The product of the shortcomings is well worth repeating: the collective effect of law enforcement's

---

[7] While the misidentification of Garrett—even after CI-1 identified McDuffie to law enforcement, positively identified McDuffie in a photo presented to them by law enforcement, and then failed to either realize or correct this misidentification after both speaking to Garrett on the phone and conducting a controlled buy in a face-to-face encounter with Garrett—does not provide the basis for our decision today, we note that it further demonstrates the extent of the law enforcement blunders present in this case.

17

misconduct indicates that every weakness in the case against Garrett was withheld from the warrant judge (and as discussed below, the defects corrupted the prosecution's case). Therefore, we hold that the police misconduct rose to a level that affected the prosecution's integrity. *See Franks v. Delaware*, 438 U.S. 154, 164 (1978) ("The bulwark of Fourth Amendment protections, of course, is the Warrant Clause, . . . which surely takes the affiant's good faith as its premise . . . . [S]urely [the affidavit] is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true.").

b.

Garrett presented an alternative argument that claims the prosecution's conduct at the district court independently renders his plea involuntary under *Brady v. United States.* 397 U.S. 742. We agree. Indeed, this case presents a rare and extraordinary situation where the prosecution's actions during the pre-plea process evince a lack of candor that deprived Garrett of due process.

In *Brady*, the Supreme Court stated that if a defendant enters a guilty plea fully aware of the direct consequences, the plea "must stand unless [it was] induced by . . . misrepresentation[s] . . . ." *Brady*, 397 U.S. at 755 (internal quotation marks omitted). Courts of appeals, including our own, have since determined that the word "misrepresentations" includes certain falsehoods or omissions attributable to the prosecution. In *Fisher*, our court relied on the First Circuit's reasoning to acknowledge that "the government may not make 'plain' and 'inexcusable' misrepresentations not anchored to any permissible litigation strategy." *Fisher*, 711 F.3d at 465 (quoting *Ferrara v. United States*, 456 F.3d 278, 293 (1st Cir. 2006)). And *Ferrara* held that although there

is no requirement to disclose all the information in the government's possession to a defendant, the failure to disclose information may still render a plea involuntary in limited circumstances. *Ferrara*, 456 F.3d at 291. Specifically, evidence of "egregious circumstances" exist that "constitute[] sufficiently parlous behavior to satisfy the misconduct prong of the voluntariness test," when the government neglects to turn over evidence *and* presents a position contrary to the undisclosed evidence in the district court. *Id.*; *see also id.* at 293 ("[T]he government's nondisclosure was so outrageous that it constituted impermissible prosecutorial misconduct sufficient to ground the petitioner's claim that his guilty plea was involuntary.").

In other words, "[e]ven if the nondisclosure is not a *Brady* violation, it may be argued . . . that it made it impossible for [the defendant] to enter a knowing and intelligent plea." *Matthew v. Johnson*, 201 F.3d 353, 364 n.15 (5th Cir. 2000). We agree with our sister circuits and affirm our reasoning in *Fisher*: abusive prosecutorial discovery tactics may render a guilty plea involuntary, even if it does not amount to a *Brady* violation, when the prosecution's actions amount to deceit or lack of candor that materially affects the defendant's understanding of the case against him. *See United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457 (4th Cir. 1993) ("Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the [judicial] process.").

The Government's latent February 2 disclosure combined with its repeated representations that only one CI was used amounts to impermissible prosecutorial conduct. *Ferrara*, 456 F.3d at 291. As Garrett points out, although the prosecution was in possession of the documents that proved the truth, the Government's opposition to his motion to

19

suppress affirmatively represented that one CI was used for all three controlled buys. *See* J.A. 131–35 (Government's opposition to Garrett's motion to suppress representing to the court that "the CS" informed law enforcement "McDuffie" was selling methamphetamine and participated in each controlled buy). There was no evidence in the record to contradict the Government's account, so the district court adopted the misrepresentation. *See* J.A. 213–14 (district court referring to a single confidential source as "the CS" for the first and second controlled buys). The February 2 disclosure that revealed the truth occurred after briefing.[8] Thus, the uncertainty that began at the warrant level was cemented in the prosecution's briefing to the district court, and that defect had severe implications— including causing both Garrett and the district court to accept a flawed foundation of the case. Again, an accurate representation would have revealed that CI-1 repeatedly misidentified Garrett, CI-2 was a first-time informant who was paid for their involvement and never identified Garrett, and Detective Ebersole knowingly omitted the identity mix-up from the warrant application for the residence search. In other words, every pillar of the case against Garrett stood on shaky foundation.[9]

---

[8] Garrett filed his request for discovery on May 24, 2021. J.A. 23.

[9] This is particularly true here, where a review of the record revealed that codefendant Cole-Evans had already divulged proof that the Government made material misrepresentations to the district court. *See* J.A. 285 (Cole-Evans' reconsideration motion stating that "the government misinformed the Court that it had merely collected . . . data from its cellular data warrant" on Cole Evans. But the February 2 disclosure revealed "[t]he truth is that the police in fact tracked [Cole-Evans'] real-time physical movements . . ."); *id.* at 293 (Government's response to Cole-Evans' motion admitting that the Government had argued that it did not use Cole-Evans' geo-data, but "[t]h[e] argument was premised on the erroneous assumption that the [warrant on Cole-Evans' number] did not include location data.").

The Government nevertheless claims that no error exists because Garrett had adequate time to review the documents in the February 2 disclosure and raise any issue with the district court before he entered his plea on March 16. Oral Argument at 29:21–30:30 (counsel for the Government reasoning that the three weeks between the February 2 disclosure and the entry of the plea agreement was enough time for Garrett's counsel to review the information in the disclosure). The Government argues that because Garrett did not raise the issue with the district court, nothing in the record explains why the Government's attorney waited to disclose the materials, and therefore Garrett cannot show that the omission was egregious misconduct under a plain-error standard.

We find this argument unpersuasive because the totality of the circumstances provides a defensible reason for the delay. At oral argument, Garrett's counsel made the circumstances of the disclosure clear: although Garrett had access to the disclosure materials before his plea and six months before his sentence, the February 2 disclosure did not follow standard procedure. Oral Argument at 4:25–5:22. "This was a dump of 775 pages of evidence with the relevant misconduct scrawled into the margins of one or two of those pages." Oral Argument at 5:25–35. It took Cole-Evans' counsel six months to locate the relevant evidence and file a motion for reconsideration. Even the Government attorneys missed the relevant information in their nearly one-year review of the documents.[10]  *See* J.A. 28 (Garrett's May 24, 2021, motion for discovery asking the

---

[10] We trust that the Government did not know the relevant information (and therefore missed it in its review of the discoverable documents). Otherwise, the Government violated its duty of candor to the court. *See United States v. Rhynes*, 218 F.3d (Continued)

Government to "[d]isclose the total amount of money paid out to any informant . . . ."); *id.* at 31 (motion asking to "[s]tate whether any . . .informant . . . has communicated with Defendant . . . and, if so, . . . [give] all of the facts and circumstances pertaining thereto"). These circumstances warrant a reasonable time to allow diligent review to uncover the relevant evidence.[11]   Thus, the timing of Garrett's appeal does not negate or otherwise neutralize the plainness of the error.  *Cf. Fisher*, 711 F.3d at 469–70.

2.

---

310, 318 ("[L]awyers are officers of the court, and, as such, they owe the court a duty of candor[.]  That duty . . . forbids an attorney from knowingly presenting . . . evidence he or she reasonably believes is false.");  *see also Geders v. United States*, 425 U.S. 80, 90 n.3 (1976) ("Any violation of these strictures would constitute a most serious breach of the attorney's duty to the court . . . .").

[11] The dissent attempts to impute "should have known" knowledge on Garrett—noting that the information about the two CIs and the payment made to the second CI was not new, and instead, "could have been known by the diligence of the defendant or his counsel."  Diss. Op. at 42.  Although Garrett received the 775 pages of new discovery six weeks prior to withdrawing the motion to suppress and pleading guilty, these facts do not undermine the prosecution's duty to both know and disclose "any favorable evidence known to the others acting on the government's behalf."  *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).  Nor does this attempt appreciate the totality of the circumstances surrounding the delay—including that even after this unprecedented, delayed disclosure, the Government continued to represent that "a confidential informant" participated in the controlled buys as late as the plea hearing.  J.A. 263–64.  "The law of this country promises defendants due process, U.S. Const. amend. V., and the professional code to which attorneys are subject mandates candor to the court, and fairness to opposing parties[.]"  *United States v. Bartko*, 728 F.3d 327, 342 (4th Cir. 2013) (citing *Model Rules of Prof'l Conduct* R. 3.3, 3.4).  Certainly, a defendant relying on this promise does not carry a greater burden than the government to uncover information to which he was entitled and would have received but for "some particularly pernicious form of impermissible conduct[,]" like here, where the relevant information was withheld.

Earlier, we alluded to the Government's argument that the residence search warrant appropriately distinguished between the CIs.[12] It is only when one views the totality of the circumstances, consisting of both police and prosecutorial misconduct, that it becomes clear why this argument must fail. If we accept that the residence search differentiated between the CIs, then we must hold that the prosecution's deceit in its representations to the district court renders Garrett's plea involuntary.[13] After all, in its suppression briefing, the Government affirmatively referred to a single CI. *See* J.A. 131–35. Further, at Garrett's plea hearing, contrary to any awareness that multiple CIs were used, the Government's attorney stated that "a confidential informant" informed investigators of a drug dealer operating in the area, and that law enforcement "us[ed] this confidential informant" in the first controlled buy. J.A. 263–64. For the second controlled buy, the Government's attorney stated that Garrett sent Cole-Evans "to meet with the confidential informant." *Id.* Alternatively, if we accept the ambiguity surrounding the number of the CIs used, then we must also accept the results of the ambiguity: the police misconduct infected the

---

[12] *See* section III.A.1.a, *supra*.

[13] The dissent also contends that Garrett "had a preview of what was in the documents" and notes that "two days before Garrett's plea, Cole-Evans filed a letter on the district court's docket detailing the infirmities on which Garrett now piggybacks." Diss. Op. at 44. There is no evidence in the record, however, that supports an inference that Garrett was aware of Cole-Evans' letter. Nor does Garrett's motion to withdraw indicate any knowledge of the letter or the new information regarding the CIs. *See* J.A. 247–48. The transcript of the plea hearing, where the Government continued to represent that a single CI was used, similarly provides no insight as to whether Garrett was aware of the contents of the later-disclosed discovery. *See* J.A. 258–67.

23

prosecution's theory of the case and caused Garrett to plead guilty without the full picture of the prosecution's case against him.

*          *          *

"It is appropriate to remind counsel that they have a 'continuing duty to inform the Court of any development which may conceivably affect the outcome of the litigation.' " *Bd. of License Comm'rs of Town of Tiverton v. Pastore*, 469 U.S. 238, 240 (1985) (quoting *Fusari v. Steinberg*, 419 U.S. 379, 391 (1975) (Burger, C.J., concurring)) (internal quotation marks omitted).  The Fourth Circuit has espoused its "confiden[ce] that a general duty of candor to the court exists in connection with an attorney's role as an officer of the court." *Shaffer Equipment Co.*, 11 F.3d at 457.  The gross misconduct that began with the police poisoned the investigation process which led to the discovery of evidence against Garrett and his ultimate arrest.  Later, the issues intensified with the prosecution's repeated misrepresentations which prevented Garrett, his counsel, and the district court from understanding the true facts of the case.  Thus, we hold that the totality of circumstances reveal extraordinary circumstances that amount to misconduct at both the police and prosecutorial levels that impeded Garrett's ability to voluntarily plead guilty to the charges levied against him.

## B.

Next, Garrett must show "a reasonable probability that, but for the misconduct, he would not have pled guilty and would have insisted on going to trial.  Courts take an objective approach to determining reasonable probability." *Fisher*, 711 F.3d at 467. (internal quotation marks and citations omitted).  Garrett must demonstrate "that a

24

reasonable defendant standing in his shoes likely would have altered his decision to plead guilty, had he known about [the Government's] misconduct." *Id.*

Garrett contends that had he known of the Government's misconduct, he would have waited for a disposition on his suppression motion and attempted to negotiate a better deal, and, if his motion failed, he would have been in a better position for trial. Oral Argument at 3:25–4:02. We agree and find that a reasonable defendant in this position would not have accepted the plea deal.

As discussed earlier, the residence search warrant affidavit did not mention the identity mix-up or CI-1's false identification. Instead, it decisively represented that McDuffie, not Garrett, had been arrested. J.A. 95. The affidavit also did not identify the use of multiple CIs or inform the court of the characteristics of each CI's involvement— that would have rightly called the credibility of all eyewitnesses/informants into question.

Further, in both the warrants that lay at the foundation of the evidence used to support the charge against Garrett—his PRTT warrant and the residence search warrant— Detective Ebersole told the warrant judge that someone other than Garrett was selling drugs, and that law enforcement had maintained surveillance and gathered evidence on a

25

Gregg McDuffie.[14]  Garrett is not McDuffie and does not resemble McDuffie.[15]  In other words, nothing in the warrant affidavits tied Garrett to the crimes being investigated.  And although the Government knew of the discrepancies, neither law enforcement nor the prosecution corrected the record.  Before the February 2 disclosure, Garrett had no way of knowing how deep the pervasiveness of the Government's shortcomings ran.  Everything the Government omitted and/or misrepresented in this case is directly probative of the weaknesses in the case against the defendants.

Timely disclosure would have provided additional evidence of misconduct and earnestly bolstered Garrett's litigation position.  As a result, Garrett has established a reasonable probability that a defendant with knowledge of these issues would not have pled guilty.  Accordingly, we hold that, based on the facts as we now know them, there was error in the proceedings below, and that error was plain.  *United States v. Brack*, 651 F.3d 388, 392 (4th Cir. 2011) ("An error is plain when it is obvious or clear under current law.") (internal quotation marks omitted).

---

[14] We acknowledge that Garrett's PRTT warrant was secured with what appears to be a genuine belief that Garrett was McDuffie.  But the record does not support a finding that the Government relied on Garrett's PRTT for evidence to support the charges against him.  Instead, the record shows that although law enforcement used the PRTT to track Garrett shortly before the arrest, it was an independent traffic violation that led to the arresting stop.  J.A. 238 (using the PRTT warrant to track Garrett the same day as his arrest); *id.* (stating "Special Agent (SA) Brett Allan observed a gray Nissan Maxima . . . traveling at about 95 miles an hour . . . ."); *id.* at 94 (residence search affidavit stating that a deputy "observed [a gray Nissan Maxima] cross the center line twice and fail to use [its] turn signal.")  After executing a traffic stop, the deputy "detected an overwhelming odor of [drugs, and] . . . [a] probable cause search recovered a large quantity of suspected" drugs).  J.A. 95.

[15] *Compare* J.A. 134 (photo of Garrett), *with* J.A. 85 (photo of McDuffie).

26

C.

Garrett must also show "that this error affected his substantial rights." *Sanya*, 774 F.3d at 816. "The Supreme Court has clearly instructed that to establish a violation of substantial rights, a defendant need only demonstrate a 'reasonable probability' that the error led him to enter the plea." *Sanya*, 774 F.3d at 819–20 (quoting *United States v. Dominguez*, 542 U.S. 74, 83 (2007)). "[A] defendant must thus satisfy the judgment of the reviewing court, informed by the entire record, that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding." *Dominguez*, 542 U.S. at 83 (internal quotation marks omitted). Our conclusion that Garrett would have litigated his suppression motion had he known of all law enforcement errors obligates a finding that his substantial rights have been affected.

Still, under the plain-error standard, "we will not correct any error unless we are convinced that a refusal to do so would seriously affect the fairness, integrity or public reputation of judicial proceedings. In determining whether these requirements have been met, we consider the full record." *Sanya*, 774 F.3d at 816 (internal quotation marks omitted). "[A]n error may 'seriously affect the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *United States v. Olano*, 507 U.S. 725, 736–37 (1993).

The collective conduct here affects the integrity and reputation of judicial proceedings at every level. Throughout the investigation, law enforcement maintained that CI-1 provided information that McDuffie, or "Duff," was selling drugs. S.A. 1008 (PRTT warrant application); J.A. 89 (warrant application for residence search). However, once

27

the identification error was revealed, law enforcement's internal documents told a new version of the story. Internal records stated that CI-1 provided information that a person with the nickname "Dutch," with no known government name, was selling drugs.[16] Dutch is Garrett's known alias. In other words, the record reveals a factual discrepancy between what the warrants represented transpired in this investigation and what law enforcement records show after the mix-up was discovered. Law enforcement may not change a story it has already established after that story is called into question—at least not without a justifiable explanation.

Additionally, the prosecutorial practice is unsettling, especially since it is not a new or isolated incident from the United States Attorney's Office in the Eastern District of North Carolina. During oral argument, the Government admitted that it should have been more careful in its handling and presentation of this case. *See* Oral Argument at 18:05–18:08 (Government counsel stating that the attorney responsible for briefing below "fell short of the standards [the office] sets for [them]selves"). As we discussed, Garrett and the district court had no reason to disbelieve, and most importantly, no mechanism to

---

[16] *Compare* J.A. 129 (Wilson County Sheriff's Office internal summary of events stating that "[i]nvestigators in this case mistakenly identified 'DUTCH' as Gregory Latroy McDuffie . . ."); *Id.* at 232 (Department of Justice internal "Correction of identification" report—filed the day after Garrett's arrest— stating that the CIs only knew Garrett as his alias, "Dutch"); *id.* at 131 (Government response to Garrett's suppression motion stating that "a . . . [CI] told Wilson County Investigators that a man known as 'Dutch' was selling methamphetamine in the area"); *id.* at 263–64 (Government counsel at the plea hearing stating same) *with id.* at 89 (residence search probable cause affidavit stating, "CS advised Detective Massey that *a Gregg McDuffie, alias 'Duff'* . . . was involved in the distribution" of drugs) (emphasis added); S.A. 1008 (PRTT warrant probable cause affidavit stating same).

factcheck, the Government's misrepresentations when they were made.  The Government's misrepresentations therefore placed all parties on a faulty foundation that influenced both Garrett's and the district court's theories of the case.  Further, the disclosure that contained the information necessary to correct the falsity occurred after briefing concluded.

These inattentive mistakes appear to stem from a troubling practice in this United States Attorney's Office.  *See United States v. George*, 95 F.4th 200, 212 (4th Cir. 2024) (Thacker, J., concurring) ("[T]his court has previously questioned this particular United States Attorney's Office's commitment to constitutional and unabusive discovery practices."); *United States v. Bartko*, 728 F.3d 327, 341 (4th Cir. 2013) (discussing three cases where the United States Attorney's Office in the Eastern District of North Carolina's representation "involv[ed] discovery abuse by government counsel in this district").  "Mistakes happen . . . . Nevertheless, the frequency of the 'flubs' committed by this office raises questions regarding whether the errors are fairly characterized as unintentional." *Bartko*, 728 F.3d at 341.

And, to no fault of his own, in deciding whether to plead guilty, Garrett relied on these government flubs carried out by the police and the prosecution which affected his view of the case against him.  Indeed, Garrett's "misapprehension stems from [more than] *an* affirmative government misrepresentation that strikes at the integrity of the prosecution as a whole." *Fisher*, 711 F.3d at 466 (emphasis added & internal quotation marks omitted).  Rather, several failures throughout the investigatory and judicial processes influenced his mistaken view.  True, Garrett was aware of the identity mix-up and brought it to the court's attention before he chose to plead guilty.  But had he known or had reason to know that in

addition to that issue, law enforcement and the prosecution were misrepresenting additional crucial aspects of the evidence in his case, he would have had stronger footing to defend his case at trial or negotiate another plea with all relevant evidence on the table. *Cf. Brady*, 397 U.S. at 756 ("[T]he decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted.").[17] The cumulative effect of the multi-layered errors tainted every level of this case. Allowing this conduct to stand would seriously affect the public reputation of judicial proceedings. Accordingly, we vacate Garrett's plea to uphold "the important interest of deterring police misconduct," and to protect against "undermin[ing] public confidence in our judicial system." *Fisher*, 711 F.3d at 469, 470.

IV.

The "gross police misconduct" here clearly "goes to the heart of the prosecution's case." *Fisher*, 711 F.3d at 466. The prosecution adopted the misrepresentations and further blurred the accuracy of the record. The late disclosure, Garrett's only hope of learning the truth, came too little, too late. The delay obstructed Garrett from accessing the information he needed to understand the case against him. These circumstances establish plain error. For these reasons, Garrett's guilty plea and sentence are vacated, and the case is remanded for further proceedings.

---

[17] Garrett alleged that the district court's denial of Cole-Evans' suppression motion was a part of his plea calculus. Opening Br. at 7.

*VACATED AND REMANDED*

QUATTLEBAUM, Circuit Judge, dissenting:

In a remarkable decision, the majority vacates Dashawn Leonard Garrett's guilty plea as not knowing or voluntary based on newly discovered information. What makes the decision remarkable is the supposed newly discovered information was not new at all. Garrett undisputedly had the very information that the majority says would cause a reasonable person to plead not guilty for six weeks before his guilty plea. To the majority, this doesn't matter. The majority overlooks Garrett's possession of the relevant information for two primary reasons. The majority's first reason is that, before Garrett acquired this information, the officers who arrested him and the government that prosecuted him failed to disclose all the information about confidential informants used to secure his arrest. Its second reason is that the information Garrett needed was part of a 775-page production and that six weeks was not enough time to review that number of documents.

These reasons fall well short of our standards for vacating plea agreements. Guilty pleas—which must be "accorded a great measure of finality"—can be withdrawn only if not "knowingly and voluntarily made." *United States v. Paylor*, 88 F.4th 553, 560 (4th Cir. 2023) (first quoting *United States v. Akande*, 956 F.3d 257, 265 (4th Cir. 2020); and then quoting *United States v. Fisher*, 711 F.3d 460, 462 (4th Cir. 2013)). Even if—as the majority emphasizes—the officers and the government behaved badly, the government produced discovery that gave Garrett the information that he concedes he needed to decide whether to plead guilty. And he had that information six weeks before he pled guilty. So, any earlier substandard disclosures by the officers and the government had no bearing on what he knew or should have known at the time he decided to enter a guilty plea. Perhaps

32

more surprising is the majority's decision that six weeks was not enough time for Garrett to review the 775 pages. That means in the Fourth Circuit, seemingly as a matter of constitutional law, parties cannot be expected to review 130 pages a week—or 18 pages per day. As explained below, this cannot be right.

Additionally, *Fisher* limits the ability to withdraw a plea to situations that involve blatant and material misrepresentations, involve intentional misconduct and strike at the integrity of the prosecution as a whole. The majority purports to apply that standard but does so in a way that permits withdrawal when none of those requirements are met.

I share the majority's frustration with certain conduct by the government. But our ordered system of justice requires that we follow our precedential standards. Doing so here requires that we reject Garrett's appeal. I respectfully dissent.

## I.

A grand jury indicted Garrett and Trevor Cole-Evans for various federal crimes involving trafficking methamphetamine and possessing guns. Both Garrett and Cole-Evans moved to suppress evidence against them but on different grounds.

### A. Garrett's Motion to Suppress

Garrett sought to suppress evidence that law enforcement recovered while executing a warrant to search a house located at 426 South Pine Street. The application for that warrant included a probable cause affidavit prepared by Detective Maryssa Ebersole of the Johnston County Sheriff's Office. According to the affidavit, a detective with the Wilson County Sheriff's Office, Brandon Massey, "developed a Confidential Source of

33

Information (CS) regarding the distribution of methamphetamine" from a Gregory McDuffie, who lived at the Pine Street residence. J.A. 89.

On February 3, 2021, the confidential informant placed a recorded call to a phone number ending in 1711 and arranged to buy an ounce of methamphetamine from the person believed to be McDuffie. About ten minutes after the phone call, Detective Ebersole observed a silver Volvo, driven by the individual thought to be McDuffie, arrive at the Pine Street residence. The individual drove the silver Volvo to the agreed meeting point and sold the methamphetamine to the informant.[1]

On February 16, officers arranged for a second controlled buy using a different confidential informant. While the first informant worked with the Wilson County Sheriff's Office, the second informant worked with the City of Wilson Police Department. The affidavit referred to that informant as "a CWP confidential informant (CS)." J.A. 92. Earlier that morning, Detective Ebersole observed the same individual thought to be McDuffie arrive at the Pine Street house in the silver Volvo. This second informant told law enforcement that he had talked with the person they thought was McDuffie. According to the second informant, the person believed to be McDuffie would send his cousin to sell the informant an ounce of methamphetamine. After that, Ebersole saw Cole-Evans leave the Pine Street house and then sell meth and ecstasy to the second informant. Ebersole also

---

[1] Based on those events, Detective Ebersole, on February 8, applied for and obtained a pen register trap and trace order ("PRTT") to monitor and track the phone ending in 1711 used by the drug dealer to coordinate this initial controlled buy. But she did not refer to this phone warrant when she applied for the separate warrant to search the Pine Street house.

34

observed Cole-Evans and the individual thought to be McDuffie at the Pine Street house later that afternoon.

On February 24, officers "participated in a 3rd buy/walk operation" using the second informant. J.A. 94. Detective Ebersole saw the individual she believed to be McDuffie leave the Pine Street house in the silver Volvo. The individual entered the second informant's vehicle and sold him more meth.

On March 9, at approximately 12:56 PM, officers stopped a Nissan Maxima after it twice crossed the center line of a highway and failed to use a turn signal. An officer identified the man driving the vehicle as Cole-Evans and misidentified the passenger as McDuffie. Having smelled marijuana, the officer searched the vehicle and found "a large quantity of suspected methamphetamine." J.A. 95. The officer arrested both Cole-Evans and the individual misidentified as McDuffie. Sometime during this stop, law enforcement discovered that the person they had called McDuffie was actually Garrett.

Law enforcement did not hesitate. No later than 2:01 PM, an hour after the traffic stop had started, Detective Ebersole submitted the warrant application to a state court judge. Although the officers who stopped and arrested Garrett just an hour or so earlier had learned the individual who they thought was McDuffie all along was actually, in fact, Garrett, the warrant application submitted by Ebersole still referenced McDuffie as the person to be searched. Additionally, the application contained a photograph depicting McDuffie, not Garrett. The warrant to search the Pine Street house was executed at 2:46 PM. In searching the house, officers recovered drugs, digital scales, several guns and ammunition. They also found photos and documentation of Garrett. In an interview with

35

investigators later that day, Garrett admitted that the drugs and guns belonged to him. In December 2021, Garrett moved to suppress this evidence on the ground that the affidavit seeking the house warrant failed to disclose that officers had arrested him under the mistaken belief that he was McDuffie.

## B.  Cole-Evans' Motion to Suppress

Cole-Evans also moved to suppress, challenging a PRTT authorizing the monitoring and tracking of his cellphone. Detective Massey—who was with the Wilson County Sheriff's Office—submitted an application for the PRTT on Cole-Evans' phone on February 16, 2021, just after the second controlled buy. In the application, he explained that officers began their investigation earlier that month and "were able to purchase a quantity of crystal methamphetamine from McDuffie using a confidential source of information." J.A. 117. "Based on the information gathered during this [initial] purchase a pen register was applied for and granted on the phone number that was being used by McDuffie." J.A. 117. In seeking to obtain a similar PRTT for Cole-Evans, Detective Massey referred to the February 16 second controlled purchase involving Cole-Evans. Describing that purchase, Detective Massey represented that "McDuffie made contact with the CS and told them that he was not going to be able to deliver the crystal methamphetamine that had been ordered" but "told the CS that he was going to send his cousin to make the delivery." J.A. 117. After conducting the controlled purchase, Detective Massey continued, "the CS was able to positively identify Cole-Evans when shown a picture." J.A. 117. Moving to suppress the fruits of the PRTT, Cole-Evans argued that the PRTT application intentionally or recklessly omitted that the phone number attributed to

36

him in the affidavit was linked to another subscriber and that officers used a suggestive method to identify him.

## C. Garrett's Guilty Plea and Sentence

The government opposed both suppression motions. In both of its response briefs, the government referred to the confidential sources as "the CS" or "a CS." J.A. 131–35. It did not differentiate between the Wilson County Sheriff source used in the first buy and the City of Wilson Police source used in the second and third. In opposing Garrett's motion to suppress the evidence discovered at the Pine Street house, the government portrayed the misidentification of Garrett as McDuffie as an "honest mistake" that did not invalidate the warrant to search the house, emphasizing that it was Garrett—regardless of any mix-up about his name—who dealt with law enforcement all along and that it was Garrett's dealings, not his name, that gave rise to the probable cause to search his residence. J.A. 137–46. In opposing Cole-Evans' motion to suppress the fruits of the PRTT, the government argued that "[t]he installation and use of a pen register/trap and trace device is not a search within the meaning of the Fourth Amendment." J.A. 153 (citing *Smith v. Maryland*, 442 U.S. 735, 745–46 (1979)).

The district court scheduled a suppression hearing for February 25, 2022. But without waiting, it denied Cole-Evans' motion on February 22 on the ground that the PRTT was not a search within the Fourth Amendment. As for Garrett's motion to suppress, the district court continued the hearing upon Garrett's request, rescheduling it for March 16.

Two days before Garrett's rescheduled hearing, on March 14, Cole-Evans filed a pro se letter on the district court's docket indicating that his attorney had received

37

"additional discovery" at the beginning of February. J.A. 219. Cole-Evans explained that the new discovery revealed that there were two confidential sources, not one. And he asserted that, in applying for a PRTT for his phone, Detective Massey had conflated the informants to mislead the reviewing judicial officer. The new discovery also indicated, Cole-Evans asserted, that the second confidential source had never before been used in a controlled buy and had been paid.

On March 15, the day after Cole-Evans filed his letter discussing the information about two confidential informants in the late-produced documents, Garrett moved to withdraw his motion to suppress. In that motion, he advised the court that he intended to enter a guilty plea the next day. The court granted the motion the same day. On March 16, Garrett entered a written agreement to plead guilty to conspiring to distribute and possess with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846; possessing a firearm as a felon on October 31, 2020, in violation of 18 U.S.C. §§ 922(g)(1), 924 (2018); and distributing methamphetamine on February 24, 2021, in violation of 21 U.S.C. § 841(a)(1). Garrett also agreed to waive his right to appeal his conviction or sentence. The same day that Garrett entered the plea agreement, the district court took his plea under Federal Rule of Criminal Procedure 11(b).

There is no dispute that Garrett received the same discovery materials that Cole-Evans complained about in his letter filed two days earlier. Despite that, during the proceedings on March 16, Garrett did not mention any issues with discovery. He did not comment on anything in the discovery materials or ask for more time to review them.

38

In a subsequent hearing, the district court sentenced Garrett. The U.S. Sentencing Guidelines advised a term of imprisonment ranging from 262 to 327 months. The criminal statutes Garrett admitted to violating required a minimum sentence of 180 months. The district court varied downward to impose a cumulative prison sentence of 240 months, supervised release and a $300 special assessment, all confirmed in a written judgment. Again, as in the plea hearing, Garrett never mentioned the discovery materials produced by the government in early February. Instead, on July 19, 2022, Garrett timely appealed from the final judgment.

### D. Cole-Evans' Motion to Reconsider

On August 3, after Garrett appealed but before appellate briefing, Cole-Evans moved the district court to reconsider the denial of his suppression motion. Building on his pro se letter, Cole-Evans submitted that, on February 2, 2022, after briefing on the suppression motions had wrapped up, "the government produced latent discovery which completely alters the Fourth Amendment analysis in this case." J.A. 285. According to Cole-Evans, this discovery revealed that his PRTT had been used not just as a pen register but also to track his real-time movements, a search under *Carpenter v. United States*, 585 U.S. 296 (2018). Cole-Evans also asserted that the new discovery showed that Detective Massey omitted information in applying for the PRTT to mislead the reviewing judicial officer into thinking that investigators had used only one confidential source, when officers had actually used two confidential informants—one with the Wilson County Sheriff, the other with the City of Wilson Police. Cole-Evans asserted the second informant had been paid $200 and had not previously served in such a role. In light of these

39

discoveries, Cole-Evans asked the court to test the truthfulness of the Cole-Evans PRTT application in a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). The district court ordered the government to respond.

In its response, the government conceded that it mistakenly argued that the Cole-Evans PRTT "did not implicate the Fourth Amendment." J.A. 293. Still, the government argued that Cole-Evans was not entitled to a *Franks* hearing. To begin, the government asserted that materials produced well before Cole-Evans' motion to suppress "referenced the use of different confidential sources during the investigation." J.A. 301. Next, the government countered that Cole-Evans did not establish that Detective Massey had prepared the PRTT application with the requisite intent to mislead. Finally, the government portrayed the omissions as immaterial, arguing that even with the omitted information, the PRTT application still would have been supported by probable cause.

The district court ruled for Cole-Evans. It granted the motion to reconsider, noting that it had relied on the government's faulty premise that the Cole-Evans PRTT had not authorized tracking Cole-Evans' real-time location. And the court scheduled a *Franks* hearing. The court also found that the Cole-Evans PRTT affidavit "refers to only one confidential source as the source of information included in the affidavit," while "[l]atent discovery" revealed that a second confidential source, new to working with law enforcement, had been paid. J.A. 311. The court continued:

> Importantly, the [Cole-Evans PRTT] affidavit's failure to distinguish the two confidential informants leads the reader to believe that the confidential source who assisted law enforcement in securing a pen register for a telephone number being used by McDuffie is the same confidential source being relied upon by law enforcement to seek a pen register for a telephone

number associated with defendant, thereby imputing the credibility of the first confidential source to the second. . . . There is no statement in the affidavit to establish the credibility or reliability of either of the confidential sources cited. Accordingly, the omission of the fact that there were two separate confidential sources utilized appears to be an omission made at a minimum with reckless disregard for the truth.

J.A. 311–12. The court rejected the government's immateriality argument since the second confidential source linked Cole-Evans to the drug deal.

Before the *Franks* hearing could occur, the government dismissed all charges against Cole-Evans.

## II.

On appeal, Garrett largely attempts to follow in Cole-Evans' footsteps. Because Cole-Evans complained about the content and timing of discovery in seeking reconsideration of the denial of his motion to suppress, Garrett uses the same basic argument. But unlike Cole-Evans, Garrett pled guilty. Because of that, Garrett must satisfy a more rigorous test. In an attempt to pass it, Garrett points to two distinct grounds. Primarily, he argues that the government's misleading statements about the confidential sources qualified as egregiously impermissible conduct that induced him to plead guilty, rendering his plea invalid under *Fisher*. Alternatively, Garrett contends that the government's last-minute disclosure of information about its second informant rendered his plea invalid under *Brady v. Maryland*, 373 U.S. 83 (1963). Hardly touching the second argument, the majority runs with the first, concluding that Garrett's plea is invalid under *Fisher* because of newly discovered evidence. As explained below, both arguments must be rejected.

41

## A.  There Was No Newly Discovered Information

The majority frames the issue presented by this appeal as "whether the newly discovered information renders Garrett's plea involuntary." Maj. Op. at 2. Immediately following, it states its holding: "We find that a reasonable defendant standing in Garrett's shoes would not have pled guilty had he or she known all the relevant information. Therefore, Garrett's plea was involuntary and is now vacated." *Id*.

But the majority's premise is wrong. There was no newly discovered information. Six weeks before Garrett declared in open court that he was guilty, Garrett had all the information that he and the majority claim would have caused a reasonable person to plead not guilty. As a result, Garrett had information that clarified—to the extent clarification was needed—that there were two confidential informants and that one had never served in that role before and was compensated for his services. This information permitted Garrett to assess the officer's and the government's earlier representations about those informants and take any steps that might be available in response to them. Despite that, Garrett pled guilty.

Since Garrett had the discovery six weeks before he pled guilty, the information, by definition, could not be newly discovered. "[E]vidence is not 'newly discovered' when it was known or could have been known by the diligence of the defendant or his counsel." *United States v. Bales*, 813 F.2d 1289, 1295 (4th Cir. 1987) (quoting *United States v. Bujese,* 371 F.2d 120, 125 (3d Cir. 1967)). "Information that was already known to the defendant or which the defendant had access to cannot be used as the basis of a motion to withdraw guilty plea." *United States v. Hernandez,* 764 F. App'x 595, 596 (9th Cir. 2019)

42

(citing *United States v. Fitzhugh*, 78 F.3d 1326, 1329 (8th Cir. 1996); *see also United States v. Atkins*, 545 F.2d 1153, 1154 (8th Cir. 1976) (holding that "newly discovered evidence" was not newly discovered because "appellant's counsel was furnished with a copy . . . prior to trial. He could have pursued the matter . . . ."). In fact, I have found no case where a court vacated a guilty plea based on newly discovered information where the defendant has that information prior to his plea—much less six weeks before.

However, following the logic of the majority's decision, Garrett's possession of the relevant information prior to pleading guilty apparently does not matter in the Fourth Circuit. The majority finds that "the totality of the circumstances provides a defensible reason for the delay" between the February 2 production and Garrett's attempt to withdraw his plea for the first time on appeal. Maj. Op. at 21. According to the majority, those circumstances are that the information was in the margins of two pages among a 775-page production. The majority holds "[t]hese circumstances warrant a reasonable time to allow diligent review to uncover the relevant evidence." *Id.* at 22.[2]

For two reasons, this cannot be right. First, the majority's explanation that Garrett did not have enough time to understand the contents of the documents ignores the fact that he did not even ask for more time to conduct a review. He obviously knew that he had 775

---

[2] The majority also reasons that "[i]t took Cole-Evans' counsel six months to locate the relevant evidence and file a motion for reconsideration. Even the Government attorneys missed the relevant information in their nearly one-year review of the documents." Maj. Op. at 21. But those statements lack support in the record. Nothing in the record indicates when Cole-Evans began reviewing the documents or how the government located the 775 pages it produced.

43

pages of documents at the time he pled guilty and knew whether or not he had reviewed them at the time of his guilty plea. Also, he had a preview—or at least access to a publicly filed preview—of what was in the documents. Recall that two days before Garrett's plea, Cole-Evans filed a letter on the district court's docket detailing the infirmities on which Garrett now piggybacks.

And let's not forget that a plea, and thus a plea hearing, only happens when a defendant asks for it. In other words, a plea hearing cannot happen without the defendant's agreement. Thus, Garrett had control over whether the hearing on his guilty plea went forward. Despite that, he did not ask for more time to review the documents. He plowed ahead with his guilty plea.

Second, by explaining that "[t]hese circumstances warrant a reasonable time to allow diligent review to uncover the relevant evidence," Maj. Op. at 22, the majority holds that six weeks is not a reasonable time to review 775 pages. This conclusion ignores reality and is unworkable. To explain, let's do some basic math. To review these documents in six weeks, Garrett would have only had to review roughly 130 pages per week, or 18 per day. To the majority, that lift is too heavy.

I fear the implications of this reasoning. What does this mean for when a case with 100,000 documents can be tried or pled? If defendants in such cases receive the time Garrett had here to review those 100,000 pages of documents, the pleas or trials would not take place for approximately 15 years. But under the majority's standard, even that is not enough time. Or imagine a case with 1,000,000 documents. If a court gave a defendant in such a case the time Garret had, the case would not be tried for nearly 152 years. But again,

44

under the majority's reasoning, that would not be enough time. Almost certainly, this decision will sow confusion in the district courts forced to wrestle with these perplexing timeframes.

## B. No Blatant and Material Misrepresentation

There are other problems with the majority's decision. Our precedent holds that a guilty plea can be withdrawn "'when the defendant has been misinformed' as to a crucial aspect of his case." *Paylor*, 88 F.4th at 560 (quoting *Fisher*, 711 F.3d at 462). To set aside a plea on this basis,

> a defendant who was fully aware of the direct consequences of the plea must show that (1) "some egregiously impermissible conduct (say, threats, *blatant misrepresentations*, or untoward blandishments by government agents) antedated the entry of his plea" and (2) "the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice."

*Fisher*, 711 F.3d at 465 (emphasis added in *Fisher*) (quoting *Ferrara v. United States*, 456 F.3d 278, 290 (1st Cir. 2006)). Garrett mainly contends that the government's misleading language about its informants prevented him from properly moving to suppress the evidence against him and induced him to plead guilty, making that plea invalid. But Garrett cannot show plain error on either of *Fisher*'s two prongs.

### i. Egregiously Impermissible Government Conduct

To amount to "egregiously impermissible conduct," an "affirmative government misrepresentation" must "strike[] at the integrity of the prosecution as a whole." *Id.* at 465–66; *see also Paylor*, 88 F.4th at 561, 564 (quoting *Fisher*, 711 F.3d at 466). As *Fisher* and the Supreme Court recognized, a defendant may not withdraw a guilty plea "merely

45

because he discover[ed] long after the plea ha[d] been accepted that his calculus misapprehended the quality of the State's case." *Fisher*, 711 F.3d at 466 (quoting *Brady*, 397 U.S. at 757). More is required.

*Fisher* illustrates this. That case presented "highly uncommon circumstances in which gross police misconduct [went] to the heart of the prosecution's case." *Id.* at 466. There, an officer admitted to lying about a confidential informant in an affidavit underpinning the warrant for the search that uncovered the only evidence against the defendant. *Id.* at 462–64, 466–67. Specifically, the officer admitted that he had intentionally lied first by referencing a confidential informant in his affidavit who "had no connection to the case," and second by falsely claiming that the fabricated informant identified the defendant and described the defendant's physical appearance, address and vehicle. *Id.* at 463, 466. For that "deliberate lie" and others, the officer himself later pled guilty to defrauding the justice system. *Id.* at 462, 467. We held that "the officer's affirmative misrepresentation, which informed the defendant's decision to plead guilty and tinged the entire proceeding, rendered the defendant's plea involuntary." *Id.* at 462.

Garrett attempts to show egregiously impermissible conduct by arguing that the government used vague terminology suggesting it had only one confidential source, while later discovery revealed a second confidential source with supposed credibility issues. To undermine the second informant's credibility, Garrett points to a handwritten note that seems to say "$200.00 pay CI." J.A. 234. He also cites this note as support for his claim that the second informant had not previously been used by law enforcement. No doubt, the government's imprecise language, particularly in its filings with the district court, fell

46

below its own standards. But under *Fisher*'s standard, the representations Garrett now challenges do not plainly strike at the integrity of the prosecution as a whole. This case is a far cry from *Fisher*, differing in three critical respects.

### a.  The Nature of the Information

To start, unlike in *Fisher*, law enforcement here did not invent an informant. At most, the officers sometimes—but not always—used vague terms to describe its informants. In applying for the Cole-Evans PRTT, Detective Massey spoke of "the" confidential source or CS. J.A. 117. Prosecutors followed course in responding to the suppression motions. True, that PRTT application and those briefs suggest there was only one informant. Also true, a report, produced after briefing on those motions was complete, clarified there were two confidential sources—a Wilson County Sheriff informant used for the first controlled buy, and a City of Wilson Police informant used for the controlled buys that followed.

But the critical difference here is that both confidential informants were real. And both helped the officers uncover criminal activity in this case. While Garrett should have received the February 2 production sooner, he had it long before he pled guilty. The only new information it provided beyond that already contained in the house warrant affidavit was that the second informant had not previously conducted any controlled buys and was compensated. Of course, at a hypothetical trial, Garrett might have been able to make some hay about these issues on cross-examination. But even so, it is hardly bombshell material and it undoubtedly falls well short of affirmatively identifying an informant who "had no connection to the case." *Fisher*, 711 F.3d at 466.

47

Also, Garrett had information showing there were two informants before the February 2 production. Detective Ebersole's affidavit supporting the warrant to search the Pine Street house—produced before any of the suppression briefing—drew the same distinction. It stated that "the Wilson County Sherriff's Office developed a Confidential Source" used in the February 3 controlled buy and then, when describing the controlled buys on February 16 and February 24, referred to "a CWP confidential informant," the informant from the City of Wilson Police Department. J.A. 89, 92–94.[3] The availability of this information to Garrett renders any deficiencies in the Cole-Evans PRTT application and the motion to suppress briefing pale in comparison to the facts in *Fisher*.

Seemingly recognizing that any vagueness about the number and nature of informants falls short of the blatant misrepresentations in *Fisher*, the majority must look elsewhere to find egregious misconduct. It lands on the mix-up of Garrett and McDuffie. The confidential informants knew Garrett only by his street name, "Dutch." J.A. 232. Consequently, the PRTT applications and the affidavit supporting the warrant to search the house referred to Garrett as McDuffie because that is who law enforcement thought they were dealing with. Only when officers stopped the Nissan Maxima on March 9, 2021, did

---

[3] The majority disagrees with my reading of the Ebersole affidavit. *See, e.g.*, Maj. Op. at 13. To the majority, at most, the affidavit only implies that different confidential informants were used. *Id.* at 13–14. But the affidavit expressly refers to a county sheriff informant and a city police informant. True, Ebersole did not spell out that "CWP" meant the City of Wilson Police Department. However, I cannot agree with the majority that not doing so amounts to an intentional misrepresentation.

48

they learn that the person they had been calling McDuffie was actually Garrett. J.A. 232. The majority deploys this mix-up at some times but not at others. The majority correctly acknowledges that "an involuntary plea claim based only on the identification mix-up would fail." Maj. Op. at 16. Because of that, the majority explains "it is the newly discovered information that acts as the basis of the involuntary plea." *Id*. The problem, of course, is that there is no newly discovered evidence about this Garrett/McDuffie mix-up. Garrett knew of it before he pled guilty. Indeed, that mix-up was the entire basis of his pre-plea motion to suppress. Perhaps this timing explains why Garrett abandoned the mix-up argument on appeal, failing even to mention "McDuffie" and the mix-up in his opening brief.

Despite Garrett abandoning it, and the majority's concession that Garrett knew of this information before he pled guilty, the majority still clings to "the misidentification as a part of our review of the totality of the circumstances." *Id.* Thus, in one paragraph, the majority shuns the mix-up because Garrett knew about it before deciding to plead guilty, yet in the next paragraph, the majority returns to the mix-up to help it find egregious misconduct. *Id*. at 12, 16–17.[4] I see no way to reconcile this inconsistency. The concept of the totality of the circumstances is not some magical pixie dust that transforms a mix-up

---

[4] Regardless of when Garrett received information about this mix-up, we should keep it in perspective. True, the first informant, who promised to deliver "Dutch" (Garrett's nickname), identified McDuffie. But also true, the first informant called Garrett and purchased drugs from him. The record does not reveal how or why this happened. But it shows unquestionably that the informant helped law enforcement uncover criminal conduct of Garrett. Law enforcement was hardly following a dead lead.

49

that was previously insufficient evidence into evidence that now satisfies our legal standards. Neither information about the two informants in the February 2 production nor the already-known information about the mix-up between Garrett and McDuffie come close to the information *Fisher* indicates permits withdrawal of a guilty plea.

    b. *Intent*

A second difference between this case and *Fisher*, even setting aside the majority's inconsistency in its use of the Garrett/McDuffie mix-up, is that the record here does not establish that the government intended to mislead. To be sure, the district court ordered a *Franks* hearing in Cole-Evans' case after determining, as a threshold matter, that the vague language Detective Massey used in applying for the Cole-Evans PRTT "appears to be an omission made at a minimum with reckless disregard for the truth." J.A. 312. But the district court made only a "preliminary" determination that did not resolve whether the vagueness was deliberate. *See United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021) ("To obtain a *Franks* hearing, a defendant must make a 'substantial preliminary showing' to overcome the 'presumption of validity with respect to the affidavit supporting the search warrant.'" (quoting *United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019))); *see also Franks*, 438 U.S. at 171 (explaining that a defendant's "attack must be more than conclusory and must be supported by more than a mere desire to cross-examine"). Since the government dismissed the charges against Cole-Evans, the district court never conducted a *Franks* hearing to resolve whether the vagueness was intentional. And most critical of all, the district court's statement speaks only to the vagueness of the PRTT application for Cole-Evans; the PRTT application for the phone used by Garrett contained

50

no such imprecision. In contrast, the officer in *Fisher* admitted to—and pled guilty to—deliberately defrauding the justice system by falsely identifying the confidential informant in the affidavit he submitted to obtain a search warrant. 711 F.3d at 462–63, 466.

Still, the majority finds intentional misconduct here. In doing so, it emphasizes that Detective Ebersole referred to Garrett as McDuffie in applying for the warrant to search the Pine Street house even though the mix-up was discovered less than an hour before. But that in no way confirms that Ebersole knew of and deliberately concealed the mix-up when she applied for the house warrant. Officers only learned of the McDuffie/Garrett mix-up during the traffic stop, which began merely one hour before Ebersole applied for the house warrant. Failing to correct that mix-up in the very moments they learned about it, the government contends, was an oversight but not an intentional omission. The government also raises the possibility that Ebersole was not immediately informed when the traffic stop revealed that the person they had been calling McDuffie was actually Garrett. Nonetheless, the majority casts aside all possibility of mistake in favor of finding intentional misconduct because of the sole fact that Ebersole's affidavit simultaneously stated that McDuffie had been arrested during the traffic stop and listed McDuffie as a person to be searched when the house warrant was executed. But proclaiming intent in the absence of evidence does not make it so.[5]

---

[5] Make no mistake, to reach this extraordinary result the majority disregards our role, to *review* factual findings and legal conclusions. *See Lovelace v. Lee*, 472 F.3d 174, 203 (4th Cir. 2006) ("[W]e should be 'mindful that we are a court of review, not of first view.'" (*quoting Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)). Instead, putting on its district court hat, the majority makes specific factual findings about what the "investigating (Continued)

Once again, the majority seems implicitly to recognize this paucity of evidence. So, it grasps for more, relying on what it calls the misconduct's "cumulative effect" or "collective effect" on Garrett's prosecution. From those consequences, the majority infers nefarious intent. But this obscures *Fisher*'s requirement. The question is law enforcement's intent, not after-the-fact consequences. Such consequences prove little, if anything, about before-the-fact state of mind. So, this last basis for establishing intent falls short, too.

### c. The Resulting Evidence

Third, whether intentional or not, the vague descriptions in the Cole-Evans PRTT application and the government's suppression briefing did not lead to evidence against Garrett. As we recently explained, the officer's deliberate lie in *Fisher* led to the discovery of "the only evidence against the defendant." *Paylor*, 88 F.4th at 561 (citing *Fisher*, 711 F.3d at 462–64). In *Fisher*, the prosecution depended on the falsified affidavit. The defense attorney declared under oath that had she known of the officer's lie, she would have taken an entirely different approach to the case; the government acknowledged it would have disclosed the officer's misconduct to the defense had it discovered the misconduct before the guilty plea; and the district court wrote, "[u]nquestionably, if [the

---

team" knew or did not know and about Detective Ebersole's state of mind at the time of submitting the house warrant affidavit. Maj. Op. at 14–15. The majority proclaims the state of mind of an entire (and undefined) team of individuals even though those officers never had an opportunity to testify about what they knew and when and why they did what they did. And while the majority says "we make no explicit findings as to the wrongdoing or ill motive of any particular office," that disclaimer rings hollow in light of its earlier factual findings—that the investigating team made intentional misrepresentations. *Id*. at 16.

52

defendant] had known of [the officer's] criminal misconduct, he would have filed a motion to suppress, and the motion may well have been successful." *Fisher*, 711 F.3d at 466–67. The record in *Fisher* clearly established that the faulty warrant was the linchpin of the government's case, and even the majority acknowledges that "the record is not as clear-cut" here. Maj. Op. at 12 n.4.

The shortcomings in the Cole-Evans PRTT application and the government's suppression briefing did not infect the entire case against Garrett. To monitor Garrett's movements, investigators used the separate PRTT for Garrett's phone, which was obtained after the first informant completed the first controlled buy from Garrett on February 3 and over a week before law enforcement applied for the Cole-Evans PRTT. Investigators used this first PRTT and physical surveillance to track Garrett as he traveled in the Nissan Maxima on March 9, and only while following the vehicle did they realize from the Cole-Evans PRTT that Cole-Evans had joined Garrett inside the car. After stopping the car for traffic violations, law enforcement smelled marijuana and conducted a search of the car that revealed "a large quantity" of methamphetamine that Garrett later admitted was his. J.A. 95.

Nonetheless, the majority asserts that the government did not rely on Garrett's PRTT to obtain evidence against Garrett. Maj. Op. at 26 n.14. It explains that "the record shows that although law enforcement used the PRTT to track Garrett shortly before the arrest, it was an independent traffic violation that led to the arresting stop." *Id.* But the officers observed the traffic violation only because they were monitoring the vehicle using the Garrett PRTT. The government relied on neither its later suppression briefing nor the

53

Cole-Evans PRTT to effectuate the stop and gather evidence against Garrett. Rather, the Garrett PRTT, which contains no ambiguity about its informant, permitted the officers to track Garrett and to execute the lawful traffic stop. And that lawful traffic stop led to the house warrant, which in turn led to the evidence the government would have used to prosecute Garrett. That evidence from the Pine Street house included 28 grams of crystal methamphetamine, 1.8 grams of cocaine base, 404 grams of marijuana, 2.5 dosage units of Xanax, 7 dosage units of suboxone, and three digital scales, one of which bore off-white crystal residue. They also recovered a 0.45 caliber pistol with a high-capacity magazine, a 9 mm pistol, a 10 mm rifle, and numerous cases of ammunition. Garrett admitted that all of these drugs and guns were his. In responding to the suppression motions, the government failed to distinguish between its informants, but law enforcement had gathered the evidence against Garrett long before any ambiguity arose. Unlike the officer's lie in *Fisher*, the government's misleading language here did not lead to the discovery of the only evidence against Garrett.

Retracing our steps, this case doesn't resemble *Fisher*. The nature of the information, the evidence of intent to mislead and the resulting evidence fall well short of what *Fisher* requires. All that said, I am troubled by the government's briefing in response to the motions to suppress. That briefing does not distinguish between the two informants. In fact, it suggests there is just one. But the government's failure to follow its own standards does not rise to the standard *Fisher* provides for rendering a plea invalid—at least not on plain error review. Unlike in *Fisher*, the government's conduct here was not so egregiously impermissible that it struck at the integrity of the prosecution as a whole. Even if *Fisher*

54

extended to these circumstances, any error would be far from "clear and obvious," a showing required under plain error review. *United States v. Catone*, 769 F.3d 866, 871 (4th Cir. 2014).[6]

### ii. Materiality

Pivoting to *Fisher*'s second prong, Garrett must also show materiality—that government misconduct "induced him to plead guilty." 711 F.3d at 467. The defendant need not show that but for the misconduct he "undoubtedly would have prevailed." *Id.* at 468. Rather, he must show that "a reasonable defendant standing in his shoes likely would have altered his decision to plead guilty" had he known of the misconduct. *Id.* at 467.

---

[6] There is another potential issue with the majority's conclusion. While the majority vacates the plea as invalid under *Fisher*, a chunk of its analysis seems to combine aspects of both Garrett's blatant misrepresentation argument under *Fisher* and his late disclosure argument under *Brady v. Maryland. See* Maj. Op. at 19 ("The Government's latent February 2 disclosure combined with its repeated representations that only one [confidential informant] was used amounts to impermissible prosecutorial conduct."); *id.* at 27 ("The *collective conduct* here affects the integrity and reputation of judicial proceedings at every level." (emphasis added)). This extends *Fisher*'s rule against material "threats, *blatant misrepresentations*, or untoward blandishments by government agents," to disclosure disputes otherwise governed by *Brady v. Maryland* and its progeny. *Fisher*, 711 F.3d at 465 (emphasis added in *Fisher*) (quoting *Ferrara*, 456 F.3d at 290); *see* Maj. Op. at 19 ("[A]busive prosecutorial discovery tactics may render a guilty plea involuntary, even if it does not amount to a *Brady* violation, when the prosecution's actions amount to deceit or lack of candor that materially affects the defendant's understanding of the case against him."). That shift is problematic when the trial right provided by *Brady* may not even apply at the pre-trial plea phase, but even more so against our plain error standard. *See infra* Part II.C. Nevertheless, I do not take an opinion on whether non-disclosure, rather than affirmative misrepresentation, might suffice to invalidate a plea since Garrett's misrepresentation and non-disclosure arguments, as already discussed, should fail on their own. And regardless of this potential issue, a winning argument cannot be concocted by cobbling together two losing ones.

Garrett argues that the government's imprecise description of its sources combined with its last-minute production of relevant documents would have caused a reasonable person in his shoes to plead guilty.[7] The majority agrees. However, it is tough for Garrett to argue that the statements in the Cole-Evans PRTT application and the government's suppression briefing were material when, as just discussed, they did not lead to the discovery of any evidence that was actually used against him.[8] Putting that obstacle aside, Garrett still cannot show that the misstatements were material when he decided to plead guilty despite having all of the information at his fingertips.

By the time Garrett pled guilty, he had received various indications about both confidential sources. When Garrett first moved to suppress, he had access to the search warrant for the Pine Street house, which mentioned two informants—one developed by the county sheriff's office, the other developed by the city police department. Later, on February 2, 2022, as already discussed, the government produced the documents on which Garrett relies to impugn the sources' credibility. While this discovery came after the

---

[7] Garrett also emphasizes that the district court denied Cole-Evans' motion to suppress on February 22. But Cole-Evans' failure on his suppression motion would have offered little insight into Garrett's chances of succeeding on his motion to suppress, which raised a different set of issues.

[8] In resisting Cole-Evans' request for a *Franks* hearing, the government argued that including details about the second confidential informant would not have defeated the probable cause on which the Cole-Evans PRTT rested. J.A. 305–07. Granting the *Franks* hearing, the district court rejected this immateriality argument since the second confidential informant linked Cole-Evans to the drug deal. J.A. 312. However, the second informant was not necessary to link Garrett to dealing drugs, considering he had already sold drugs to the first informant before the second informant became involved.

briefing on Garrett's suppression motion, it came six weeks before March 16, the day on which Garrett's suppression hearing had been scheduled and the day on which Garrett pled guilty. Finally, two days before Garrett's plea, Cole-Evans filed a letter on the district court's docket laying out the same critiques Garrett now raises to us.

Despite this available information, Garrett proceeded to plead guilty. Never did he ask the district court for more time. Nor did he seek to withdraw his plea until briefing this appeal, after the government dismissed the charges against Cole-Evans over six months after Garrett's plea.

The majority strains to justify this delay. It quotes Garrett's counsel complaining that he had to comb through hundreds of pages of evidence in the production. Maj. Op. at 21. But again, Garrett's counsel never requested more time to review the documents. The majority also claims that it took Cole-Evans' counsel six months to discover the relevant information about the informants and to seek reconsideration. *Id*. Yet that statement completely ignores the letter sent by an uncounseled Cole-Evans to the district court. Filed on the docket two days before Garrett's plea, Cole-Evans' letter highlights the relevant information and makes the same argument about the confidential informants that Garrett now makes And against insurmountable problems with every specific piece of evidence it cites, the majority falls back again on the amorphous "totality of the circumstances" to conclude there is "a defensible reason for the delay" between the February 2 production and Garrett's attempt to withdraw his plea. *Id*. To state the obvious, aggregating individual insufficient pieces of material evidence cannot somehow amount to collective sufficiency.

Garrett cannot demonstrate that a reasonable person in his shoes would not have pled guilty had he known of the misstatements when Garrett himself had every reason to know of those misstatements but still decided to plead guilty. Garrett has not shown that the alleged government misconduct was plainly material under *Fisher*.

## C. *Material Nondisclosure*

Alternatively, Garrett argues that his guilty plea was plainly invalid under *Brady v. Maryland*. That case and its progeny require prosecutors to disclose evidence favorable to criminal defendants that "is material either to guilt or to punishment." 373 U.S. at 87; *see also Giglio v. United States*, 405 U.S. 150, 154–55 (1972) (extending the duty to encompass post-plea material impeachment evidence); *United States v. Agurs*, 427 U.S. 97, 107 (1976) (jettisoning the requirement that a defendant must request the evidence). Garrett submits that his prosecutors violated *Brady* by producing documents mentioning the second confidential source after briefing had concluded on Garrett's motion to suppress but before Garrett pled guilty. However, due process does not require prosecutors to disclose all information that might be of use to a defendant in deciding whether to plead guilty. *See United States v. Ruiz*, 536 U.S. 622, 629–30 (2002).

As *Ruiz* held, prosecutors need not "disclose material impeachment evidence prior to entering a plea agreement." *Id.* at 633. To bypass *Ruiz*'s holding, Garrett contends that the documents produced in February 2022 contained more than impeachment evidence, since, he supposes, the information might have been used to challenge the informants' credibility and perhaps even the warrants used to gather evidence against Garrett. But even if the information would have enabled Garrett to discredit the informants, Garrett has not

58

explained how doing so would suggest that he did not commit the crimes to which he pled guilty; that is, the information might impeach a witness against him, but it likely would not exculpate him. *See Fisher*, 711 F.3d at 471–72 (Agee, J., dissenting) (characterizing evidence that officer lied about his informant in a search warrant application as impeachment evidence governed squarely by *Ruiz*). If indeed the February 2022 discovery contained only impeachment evidence, *Ruiz* would foreclose Garrett's *Brady* argument.

Even if the evidence escaped *Ruiz*'s holding, Garrett cannot show plain error since it is unclear whether *Brady* applies even to exculpatory evidence, as opposed to impeachment evidence, in a plea setting. The Supreme Court left open that question in *Ruiz*, and our court has yet to resolve it. *See United States v. Moussaoui*, 591 F.3d 263, 286 (4th Cir. 2010); *see also Fisher*, 711 F.3d at 472 (Agee, J., dissenting) ("Even if one were to assume, however, that the evidence at issue here is affirmatively exculpatory (quite an extraordinary stretch), rather than merely for impeachment purposes, there is *no* existing precedent from the Supreme Court or this Court that entitles Fisher to relief on the basis of his pre-plea claim."). Those circuits that have resolved *Brady*'s pre-plea scope have reached opposite rules. *See generally Mansfield v. Williamson Cnty.*, 30 F.4th 276, 282 n.9 (5th Cir. 2022) (Higginbotham, J., concurring) (reviewing the circuit split); Michael Nasser Petegorsky, *Plea Bargaining in the Dark: The Duty to Disclose Exculpatory Brady Evidence During Plea Bargaining*, 81 FORDHAM L. REV. 3599, 3625–31 (2013) (same). To the extent our court has considered the question, we have doubted that prosecutors' *Brady* obligations apply before a plea. *See Moussaoui*, 591 F.3d at 285 ("The *Brady* right, however, is a *trial* right . . . and exists to preserve the fairness of a trial verdict and to

minimize the chance that an innocent person would be found guilty. When a defendant pleads guilty, those concerns are almost completely eliminated because his guilt is admitted." (internal citations omitted)); *Jones v. Cooper*, 311 F.3d 306, 315 n.5 (4th Cir. 2002) (holding that *Ruiz* foreclosed any claim by the defendant that the prosecutor's failure to disclose information potentially relevant as mitigation evidence in the death-penalty phase of defendant's trial served to invalidate his guilty plea). So it is far from clear that Garrett had a pre-plea right to the information that the government failed to disclose until February 2022, preventing Garrett from establishing plain error. *See United States v. Carthorne*, 726 F.3d 503, 516–17 (4th Cir. 2013) (concluding that Guidelines calculation error was not plain because this court had not addressed the issue and other circuits were split); *United States v. Strieper*, 666 F.3d 288, 295 (4th Cir. 2012) ("[W]here we have yet to speak directly on a legal issue and other circuits are split, a district court does not commit plain error by following the reasoning of another circuit.").

In short, Garrett's disclosure argument fails whether or not the documents produced in February 2022 contained impeachment or exculpatory evidence. If those documents contained only impeachment evidence, *Ruiz* would foreclose Garrett's argument. If instead the documents contained some exculpatory evidence, Garrett still would not be able to establish a clear or obvious right to that information before pleading guilty.

## III.

I share the majority's concerns about the government's conflation of the two informants in its suppression briefing and about the government's late production of

60

documents. But dissatisfaction does not permit us to bypass our standard for invalidating pleas or our standard of review. Garrett cannot establish that his plea was invalid. Consequently, I would affirm the judgment of his conviction and dismiss his challenge to his sentence.